**MOBAY CHEMICAL CORPORATION, Plaintiff,**

v.

**Douglas M. COSTLE, Administrator, United States Environmental Protection Agency, Defendant.**

**Nos. 75 CV 238–W–3 and 76 CV 351–W–4.**

United States District Court, W. D. Missouri, W. D.

March 14, 1978.

As Amended March 21, 1978.

Joseph E. Stevens, Jr., C. David Barrier, Lathrop, Koontz, Righter, Clagett, Parker & Norquist, Kansas City, Mo., for plaintiff.

Robert Schneider, Asst. U. S. Atty., Kansas City, Mo., William A. White, Gen. Counsel, Washington, D. C., Robert M. Rader, U. S. Dept. of Justice, Civ. Div., Washington, D. C., for defendant.

## OPINION AND ORDER

### ELMO B. HUNTER, District Judge.

In this action plaintiff, a firm engaged in the business of developing, producing and marketing pesticides for agricultural and industrial use, asserts that the defendant Administrator of the Environmental Protection Agency (EPA) is violating the provisions of certain sections of the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 135 *et seq.*, as amended by the Federal Environmental Pesticide Control Act of 1972 (FEPCA), 7 U.S.C. § 136 *et seq.* (1972). Plaintiff seeks a declaratory judgment that the actions of the Administrator violate FIFRA as amended, and injunctive relief restraining the Administrator from those violations.[1] Subject

---

1. Plaintiff also seeks a declaratory judgment that a portion of FIFRA, as amended, 7 U.S.C. § 136a et seq., is unconstitutional and should be severed from the statute, together with in-

matter jurisdiction is provided by § 16(c) of FIFRA, as amended by FEPCA, 7 U.S.C. § 136n(c),[2] and venue in this District is proper pursuant to 28 U.S.C. § 1391(e)(4) (1966).

*The Regulatory Background*

The Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C. § 135 *et seq.*, originally was enacted in 1947. At that time, it applied only to pesticides shipped in interstate commerce and was administered by the United States Department of Agriculture. Until 1970, tolerances for pesticide chemicals were established by the Secretary of Health, Education and Welfare. In 1970, by Reorganization Plan No. 3, 35 Fed.Reg. 15623 (1970), both of these administrative functions were transferred to the Environmental Protection Agency (EPA).

Before any pesticide could be marketed in interstate commerce, FIFRA required that the producer have the pesticide registered. In order to obtain registration, the applicant for registration was required to demonstrate to the satisfaction of the Secretary of Agriculture and, later, to the Administrator of the EPA, the safety and efficacy of the pesticide product. If the use of a pesticide could result in a residue in or on food crops, a tolerance for such use also had to be established pursuant to § 408 of the Food, Drug and Cosmetic Act. In order to satisfy the requirements of the Acts, an application for registration of a pesticide had to be supported by substantial amounts of information, research and test data regarding the pesticide chemical.

In 1972, FIFRA was amended by Section 2 of the Federal Environmental Pesticide Control Act (FEPCA), Pub.L.No.92–516, 92d Cong., 2d Sess. (Oct. 21, 1972), 86 Stat. 973. The information required to be submitted under FIFRA also is required to be submitted under FEPCA (also referred to herein as "FIFRA of 1972"). In addition, FIFRA of 1972 extends the registration requirement to pesticide chemicals marketed in intrastate commerce and imposes further requirements for the submission of information, research and test data to assess any risk to the environment which might result from the use of the pesticide for which registration is sought. FIFRA of 1972 also provides for the classification of pesticides and requires re registration and classification of pesticides previously registered under FIFRA in order to assure that present data requirements are met for older products as well as for new ones.

FIFRA of 1972 authorized the Administrator to consider information and test data submitted in support of a previous application for registration in determining whether a subsequent application for registration had made the showings required by the Act. Section 3(c)(1)(D) of FIFRA of 1972, 7 U.S.C. § 136a(c)(1)(D), provided, however:

> . . . that data submitted in support of an application shall not, without permission of the applicant, be considered by the Administrator in support of any other application for registration unless such other applicant shall have first offered to pay reasonable compensation for producing the test data to be relied upon and such data is not protected from disclosure by section 10(b). If the parties cannot agree on the amount and method of payment, the Administrator shall make such determination and may fix such other terms and conditions as may be reasonable under the circumstances. The Administrator's determination shall be made on the record after notice and opportunity for hearing. If the owner of the test data does not agree with said determination, he may, within thirty days, take an appeal to the federal district court for the district in which he resides with respect

junctive relief prohibiting its enforcement. A three-judge court convened for the purpose of hearing and determining plaintiff's claim concerning the constitutionality of that portion of the statute will render its separate decision.

2. 7 U.S.C. § 136n(c) provides: "The district courts of the United States are vested with jurisdiction specifically to enforce, and to prevent and restrain violations of, this subchapter."

to either the amount of the payment or the terms of payment, or both. In no event shall the amount of payment determined by the court be less than that determined by the Administrator.

The two limitations expressed in § 3(c)(1)(D)—involving the Administrator's non-consideration of trade secrets and confidential or privileged information, and reasonable compensation for use of non-trade secret information—are the primary subject matter of this action.[3]

Section 3(c)(2), 7 U.S.C. § 136a(c)(2), requires that, except as provided by Section 3(c)(1)(D) and Section 10, within thirty (30) days after the Administrator registers a pesticide, he shall make available to the public the data called for in the registration statement together with such other scientific information as he deems relevant to his decision.

Section 10 of FIFRA of 1972 contains a description of information which is not subject to public disclosure:

(b) Disclosure.—Notwithstanding any other provision of this Act, the Administrator shall not make public information which in his judgment contains or relates to trade secrets or commercial or financial information obtained from a person and privileged or confidential, except that, when necessary to carry out the provisions of this Act, information relating to formulas of products acquired by authorization of this Act may be revealed to any Federal Agency consulted and may be revealed at a public hearing or in findings of fact issued by the Administrator.

(c) Disputes.—If the Administrator proposes to release for inspection information which the applicant or registrant believes to be protected from disclosure under subsection (b) of this section, he shall notify the applicant or registrant, in writing, by certified mail. The Administrator shall not thereafter make available for inspection such data until thirty days after receipt of the notice by the applicant or registrant. During this period, the applicant or registrant may institute an action in an appropriate district court for a declaratory judgment as to whether such information is subject to protection under subsection (b) of this section.

Section 4 of FIFRA of 1972 contains provisions regarding the implementation of the statute. This section provides in pertinent part that:

Sec. 4(a) Except as otherwise provided in the Federal Insecticide, Fungicide, and Rodenticide Act, as amended by this Act, and as otherwise provided by this section, the amendments made by this Act shall take effect at the close of the date of the enactment of this Act, provided if regulations are necessary for the implementation of any provision that becomes effective on the date of enactment, such regulations shall be promulgated and shall become effective within 90 days from the date of enactment of this Act.

(b) the provisions of the Federal Insecticide, Fungicide, and Rodenticide Act and the regulations thereunder as such existed prior to the enactment of this Act shall remain in effect until superseded by the amendments made by this Act and regulations thereunder: *Provided,* That all provisions made by these amendments and all regulations thereunder shall be effective within five years after the enactment of this Act.

(c)(1) Two years after the enactment of this Act the Administrator shall have promulgated regulations providing for the registration and classification of pesticides under the provisions of this Act and thereafter shall register all new applications under such provisions.

---

**3.** In 1975, § 3(c)(1)(D) of FIFRA of 1972 was amended by Section 12 of Pub.L.No.94–140 (Nov. 28, 1975). The 1975 amendment limited the compensation and nonconsideration provisions of § 3(c)(1)(D) to data submitted on or after January 1, 1970. That limitation is challenged by plaintiffs in the portion of this action which will be determined by the three-judge court convened July 20, 1976, pursuant to 28 U.S.C. § 2284.

In addition, the 1975 amendment declared that the effective date of the compensation provisions was October 21, 1972 (the effective date of FIFRA of 1972.)

(2) After two years but within five years after the enactment of this Act the Administrator shall register and reclassify pesticides registered under the provisions of the Federal Insecticide, Fungicide, and Rodenticide Act prior to the effective date of the regulations promulgated under subsection (c)(1).

Section 2(z) of FIFRA of 1972 provides that "The term 'registration' includes reregistration."

On November 19, 1973, the Administrator published in the Federal Register a document entitled "Registration of Pesticides," which is subtitled "Consideration of Data by the Administrator in Support of Applications; Interim Policy" (hereinafter the "Interim Policy Statement"). 38 Fed.Reg. 31862–31864. The Interim Policy Statement gave notice of the Administrator's determination to make effective on November 19, 1973, the provision of § 3(c)(1)(D) prohibiting the Administrator's consideration of data submitted by an applicant in support of any other application for registration unless the other applicant shall have first offered to pay reasonable compensation for producing the test data to be relied upon and such data is not protected from disclosure by § 10(b).

The Interim Policy Statement required an application for registration to contain an express offer to pay reasonable compensation for the use of any test data submitted to the EPA in support of an application for registration on or after October 21, 1972. The applicant was not required to direct this offer of compensation to anyone in particular, nor was the applicant absolutely required to identify information submitted by others on which his application for registration would rely. Instead, each applicant was required to select one of three methods of proceeding under § 2. The applicant could choose (a) to submit all required supporting data; (b) to refer to other readily available data, either in other applications or the open literature; or (c) to request that the registration proceed "on the basis of use

patterns, efficacy and safety previously established under FIFRA."

Upon receipt of an application, the Interim Policy Statement provided that the EPA would publish in the Federal Register a notice of the application, including the following information: (1) the name and address of the applicant; (2) the EPA registration number or file symbol; (3) the name of the product; (4) a listing of the active ingredients and their percentages. The Interim Policy Statement then provided that any person who is or has been an applicant and who desires to assert a claim for compensation under § 3(c)(1)(d) against an applicant proceeding under § 2(c) had sixty (60) days following the publication of notice in the Federal Register in which to make its claim. If no claim was received within that period, the application would be processed. If a claim was received within the sixty-day period, the applicant for registration was required to be notified and to elect one of three options: (1) to submit a revised application under 2(a) or 2(b); (2) to concede that the application relied upon the data on which the claim was based and to request that EPA process the application accordingly; or (3) to request EPA approval to continue under 2(c) without reliance on the data specified by the applicant. When the applicant had selected his option (no time period was specified for this response), the EPA would resume the processing of the application on the basis selected. Any claims for compensation were deferred for administrative determination or adjudication at a later date.

On May 20, 1975, the Administrator published in the Federal Register proposed regulations under the Freedom of Information Act, 5 U.S.C. § 552, which purported also to set forth the Administrator's procedures with respect to the disclosure of data under § 10 of FIFRA of 1972. 40 Fed.Reg. 21987–22002.[4] Pursuant to § 2.307(g) of these proposed Disclosure Regulations, 40 Fed. Reg. 22000 and 40 Fed.Reg. 28815, information submitted to the Administrator under

---

4. On July 9, 1975, a document supplementing and correcting these proposed regulations was published by the Administrator in the Federal Register. 40 Fed.Reg. 28814–28815.

FIFRA and FIFRA of 1972 is entitled to confidential treatment ·only if a detailed showing, by or on behalf of a business for which a confidentiality claim has been made, satisfies the EPA legal office that:

· (5) The information does not consist of scientific data (including, but not limited to test methodology and results), opinion, or argument, pertaining to or concerning the properties, behavior or effect on any organism, or a pesticide which is or has been registered under the Act or for which a notice of application for registration has been published under Section 3(c)(4) of the Act, 7 U.S.C. 136a(c)(4). For purposes of this Paragraph (5), 'Scientific Data' does not include information concerning the confidential formula of a pesticide or the manufacturing and quality control processes employed in producing the pesticide.

On July 3, 1975, regulations providing for the registration of pesticides under FIFRA of 1972 were published by the Administrator in the Federal Register. 40 Fed.Reg. 28242–28246. These regulations, hereinafter the "Registration Regulations," became effective August 4, 1975. Section 162.6(b)(5) of the Registration Regulations sets forth rules for registration of products registered prior to the effective date of the regulations:

(ii) PROCEDURES. If the registrant desires to reregister the product he shall submit an application for reregistration on a form to be provided by the Agency. Such application will be acted upon as provided in this section and in the Registration Guidelines. When these regulations require data for reregistration

which cannot reasonably be anticipated to be compiled on or before October 21, 1976, and the pesticide does not meet or exceed the criteria for risk set forth in § 162.11(a)(3), the Administrator, may, in his discretion, classify and reregister the pesticide product for a reasonable period of time pending completion of the required testing, when he determines that based upon available data, the pesticide product otherwise satisfies the requirements of these regulations and the Act.[5]

On November 28, 1975, § 4 of FIFRA of 1972 was amended by Pub.L.No.94–140 to permit the Administrator until October 21, 1977—rather than October 21, 1976—to register under FIFRA of 1972 pesticides previously registered under FIFRA. On July 3, 1975, a final regulation was published at 40 C.F.R. 162, 40 Fed.Reg. 28242, to implement the reregistration procedures.

On January 22, 1976, the Administrator published in the Federal Register a document entitled "Registration of a Pesticide Product," which is subtitled "Consideration of Data by the Administrator in Support of an Application" (hereinafter, the "Modified Interim Policy Statement"). 41 Fed.Reg. 3339–3342. The Modified Interim Policy Statement purportedly eliminated the 2(c) method of application for registration as of August 1975. In addition, the Modified Interim Policy Statement provided that any claims objecting to the Administrator's consideration of alleged trade secrets or other matter exempt from consideration had to be made within "a reasonable period of time," not less than thirty days.

---

**5.** In the Administrator's comments with regard to the Registration Regulations, 40 Fed.Reg. 28250, he stated:

"We have indicated those use patterns, chemical structures and exposure levels for which a determination on any potential risks to the health and safety of man or the environment is required prior to registration. In light of the use history and prior registration of these pesticides, we have determined that evaluation of the data indicated at § 162.8(c) is necessary and sufficient for the determination of whether or not reregistration of the pesticide product will cause an unreasonable adverse effect on

man or the environment. *EPA realizes that full compliance with the data requirements imposed on new registrations would be desirable for reregistrations as well. By October, 1976, however, EPA must register in excess of 30,000 pesticide products. It would be administratively impossible to require all of these products to satisfy the data requirements for new registration. Five year renewals of registration, however, will be processed on a staggered basis; it is at this junction that the then current data requirements for new registration will apply to all products previously registered by the Agency.*" [Emphasis supplied.]

In June 1976, the Administrator began sending to parties who have submitted data under FIFRA and FIFRA of 1972 "Notice of Determination under Section 10(b) of the Federal Insecticide, Fungicide, and Rodenticide Act" (hereinafter "10(b) Notices"), advising them that with certain exceptions, EPA intends to make public on the 31st calendar day after receipt of the Notice all records listed in an attachment to the Notice unless the party first notifies EPA that it has instituted an action under § 10(c) of FIFRA, in an appropriate United States District Court, for a declaratory judgment as to whether those records are entitled to protection under § 10(b) if FIFRA, and for preliminary injunctive relief. The Notice further provides that if the party to whom it is addressed furnishes to EPA within 30 days after receipt of the Notice a statement asserting, in a specified form, that portions of the records listed in the attachment relate to confidential formula, manufacturing methods or quality control, or information which EPA possesses only by virtue of the submission of the data in support of a registration application which has not yet resulted in the issuance of a registration, then EPA will not disclose those portions of the records on the 31st day. Instead, with respect to those records, a further confidentiality determination will be made by EPA and the claimant will be afforded a further period to seek judicial review of an adverse determination.

On September 1, 1976, the Administrator published in the Federal Register final Disclosure Regulations under the Freedom of Information Act, 5 U.S.C. § 552, which set forth the Administrator's procedures respecting disclosure under § 10 of FIFRA of 1972. 41 Fed.Reg. 36902–36924. These regulations, which became effective on October 1, 1976, set forth in § 2.208 the substantive criteria to be utilized in confidentiality determinations.[6] Pursuant to the Disclosure Regulations respecting determinations of non-entitlement to confidential treatment concerning information submitted under FIFRA and FIFRA of 1972, it is provided in part, at 41 Fed.Reg. 36916, that:

> With respect to EPA's implementation of the determination, the notice shall state that (subject to § 2.210) EPA will make the information available to the public on the thirty-first (31st) calendar day after the date of the business's receipt of the written notice (or on such later date as is established in lieu thereof under paragraph (f)(3) of this section), unless the EPA legal office has first been notified of the business's commencement of an action in a Federal court to obtain judicial review of the determination or to obtain a declaratory judgment under section 10(c) of the Act and to obtain preliminary injunctive relief against disclosure.

### Background of This Litigation

By and through its Chemagro Agricultural Division,[7] plaintiff has engaged in re-

---

6. § 2.208 of the Disclosure Regulations provides that business information is entitled to confidential treatment for the benefit of a particular business if "(a) The business has asserted a business confidentiality claim which has not expired by its terms, nor been waived nor withdrawn; (b) The Business has satisfactorily shown that it has taken reasonable measures to protect the confidentiality of the information, and that it intends to continue to take such measures; (c) The information is not, and has not been reasonably obtainable without the business's consent by other persons (other than governmental bodies) by use of legitimate means (other than discovery based on a showing of special need in a judicial or quasi-judicial proceeding); (d) No statute specifically requires disclosure of the information; and (e) Either—(1) The business has satisfactorily

shown that disclosure of the information is likely to cause substantial harm to the business's competitive position; or (2) The information is voluntarily submitted (see § 2.201(i)), and its disclosure would be likely to impair the Government's ability to obtain necessary information in the future."

7. In September, 1971, the Chemagro Corporation was merged into plaintiff and thereafter was designated as the Chemagro Agricultural Division of plaintiff. Pursuant to the merger, plaintiff succeeded to all the properties, rights, privileges, powers and franchises of the Chemagro Corporation. By and through Chemagro, plaintiff owns and operates at Kansas City, Missouri, major administrative offices, research facilities, and manufacturing facilities at which it produces substantial quantities of ag-

search and development activities with respect to agricultural and other pesticides for approximately twenty-two years, and has played a leading role in the development of agricultural pesticides which are systemic and non-persistent in the environment. During the period from 1954 to the present, plaintiff has submitted substantial information, research and test data to the Department of Agriculture, the Food and Drug Administration, and the Environmental Protection Agency in support of many applications for registration of pesticides under FIFRA and FIFRA as amended, and petitions to obtain tolerances under The Federal Food, Drug and Cosmetic Act (FFDCA).[8] On the basis of the information, research and test data it has submitted, plaintiff has obtained numerous pesticide registrations. Plaintiff has spent and currently spends multi-millions of dollars annually in research and development activities to develop, maintain and expand its registered pesticide products. To conduct these research and development activities, plaintiff presently employs in excess of 250 people, over half of which have degrees or advanced degrees in chemistry or one of the biological sciences. The information, research and test data submitted by plaintiff is used both in the development of additional formulations for registered products and in the development of new products which are chemically related to products previously developed by it.

Since 1972, at least one registration and one supplemental registration have been issued by the EPA to firms other than plaintiff which made their applications for registration in reliance on alleged use patterns based upon information, research and test data originally submitted by plaintiff. These registrations have been issued without plaintiff's permission and without any offer of compensation made directly to plaintiff by the subsequent applicant.

Since 1972, other registrants have submitted applications for reregistration of their products previously registered, referencing plaintiff's data in support of their applications for reregistration, without plaintiff's permission or any offer of compensation directly to plaintiff.

By a Stipulation and Agreement entered into May 8, 1975, in this litigation, plaintiff and defendant agreed to maintain the *status quo* pending the final disposition of this litigation on the merits. The stipulation provides that defendant publish in the Federal Register notice of all applications for registration which might involve any disclosure, consideration or use by defendant of any data submitted by plaintiff and that defendant not grant any such application if plaintiff submits to defendant a claim letter within 60 days after the publication. Several such notices of application have been published by defendant, and claims for compensation and/or privileged status have been made by plaintiff. Plaintiff is the only registrant to have submitted certain research and test data relating to the active ingredients at issue in certain of those applications; thus a pesticide which contains as an active ingredient any one of the active ingredients which plaintiff claims, for which the application for registration [9] is not accompanied by all required supporting data, cannot be registered or reregistered by defendant except in reliance upon plaintiff's information, research and test data unless the applicant subsequently develops and submits its own data. Yet defendant has not required any of the applicants involved in these pending applications to obtain plaintiff's permission or to offer plaintiff reasonable compensation for producing the information, research and test data which must be considered and relied upon by defendant in issuing the registrations sought. Defendant intends to register applications which rely upon plaintiff's data if

---

ricultural and other pesticides. In addition, Chemagro maintains research facilities in Stanley, Kansas, and Vero Beach, Florida.

**8.** 21 U.S.C. §§ 301 *et seq.* The information, research and test data submitted for purposes

of obtaining a tolerance under FFDCA are also submitted under FIFRA to obtain registration.

**9.** One exception is an application for Trichlorfon prior to the effective date of the Registration Regulations.

the data was submitted prior to January 1, 1970.

## I.

The first legal issue to be resolved involves the date upon which § 3(c)(1)(D) of FIFRA of 1972 became effective. Plaintiff contends that the effective date of the section was the date of its enactment, October 21, 1972. Defendant, on the other hand, asserts that § 3(c)(1)(D) was not effective until defendant issued his Interim Policy Statement on November 19, 1973.

Section 4 of FIFRA of 1972 provided that:

(a) Except as otherwise provided in the Federal Insecticide, Fungicide, and Rodenticide Act [subchapter II of this chapter] and as otherwise provided by this section, the amendments made by this Act . . . shall take effect at the close of the date of the enactment of this Act [Oct. 21, 1972], provided if regulations are necessary for the implementation of any provision that becomes effective on the date of enactment, such regulations shall be promulgated and shall become effective within 90 days from the date of enactment of this Act.

(b) the provisions of the Federal Insecticide, Fungicide, and Rodenticide Act and the regulations thereunder as such existed prior to the enactment of this Act . . . shall remain in effect until superseded by the amendments made by this Act and regulations thereunder: *Provided*, That all provisions made by these amendments and all regulations thereunder shall be effective within five years after the enactment of this Act.

(c)(1) Two years after the enactment of this Act the Administrator shall have promulgated regulations providing for the registration and classification of pesticides under the provisions of this Act and thereafter shall register all new applications under such provisions.

Defendant contends that the statutory provisions mean that the Administrator was granted up to two years to promulgate regulations implementing the registration provisions of FIFRA of 1972, and that applications filed prior to promulgation of those regulations would be ruled on in accordance with the earlier provisions of FIFRA of 1947. According to defendant, the earlier provisions of FIFRA remained effective until November 19, 1973, when the Administrator published the Interim Policy Statement making the registration provisions of FIFRA of 1972 effective immediately but deferring issuance of detailed regulations on compensation. Defendant therefore argues that the registration provisions of FIFRA of 1972 took effect on November 19, 1973.

Defendant has case authority in support of his position. In *Amchem Products, Inc. v. GAF Corp.*, 391 F.Supp. 124, 127 (N.D.Ga. 1975), vac. 529 F.2d 1297 (5th Cir. 1976), reinstated on rehearing, 422 F.Supp. 390 (N.D.Ga.1976), appeal docketed, No. 76–3801 (5th Cir. 1977), the district court concluded that the effective date of § 3(c)(1)(D) of FIFRA of 1972 was November 19, 1973, and that the 1975 amendment declaring the effective date to be October 21, 1972, was "solely to insure that all remaining applications which were received after October 21, 1972, were processed in accordance with the terms of Section 3(c)(1)(D)" and not to affect the validity of applications which had already been processed. 422 F.Supp. at 392.

This Court, however, cannot accept the determination reached in the *Amchem* case. Statutory terms must be construed in light of the ". . . history, terms and purposes of the legislation . . . and [derive their] meaning from the context of the statute which 'must be read in the light of the mischief to be corrected and the end to be attained.'" *NLRB v. Hearst*, 322 U.S. 111, 124, 64 S.Ct. 851, 857, 88 L.Ed. 1170 (1948). The history, terms and purposes of § 3(c)(1)(D) indicate that it was intended to be effective immediately. Its clear language concerning use of data by the Administrator—"data submitted in support of an application shall not, without permission of the applicant, be considered by the Administrator in support of any

application for registration unless . . ."—is mandatory and prohibitive and needs no regulations for implementation. Thus, applying the guideline set forth in § 4, § 3(c)(1)(D) was effective immediately upon enactment. This conclusion is consistent with the fact—admitted by the Administrator—that § 10 of FIFRA of 1972 was effective upon enactment. It is further consistent with the action which the Administrator himself took on November 19, 1973, when he purportedly "implemented" the prohibitive portion of § 3(c)(1)(D) by means of the Interim Policy Statement while deferring until a later date issuance of regulations concerning the manner and method of compensation. As the Administrator apparently recognized, the only portion of § 3(c)(1)(D) which required regulations was that portion concerning the method and manner of compensation; in view of his own action on November 19, 1973, the Administrator cannot now contend that the entire section could not become effective until issuance of those detailed regulations on compensation. Additionally, FIFRA of 1972 did not become effective on November 19, 1973, as defendant contends, for the reason that, by defendant's admission, the Interim Policy Statement was not a regulation but was "merely to indicate the manner in which the agency would proceed while formal regulations were being promulgated." It did not have the force and effect of a regulation,[10] and consequently, by the terms of § 4 of the statute requiring regulations, was not effective to implement the statutory provisions of § 3(c)(1)(D). Finally, although not determinative, the indisputable statement contained in the 1975 amendment that the "provision with regard to compensation for producing the test data

to be relied upon shall apply with respect to all applications for registration or reregistration submitted on or after October 21, 1972" certainly is illuminating as to Congressional intent when § 3(c)(1)(D) was enacted in 1972. Without doubt, as the district court noted in the *Amchem* case, the 1972 date applies to all applications not yet processed in 1975. In this Court's opinion, the 1972 data was intended from the outset to be the effective date of § 3(c)(1)(D), and the 1975 amendment was the result of Congressional desire to clarify its intention in view of the dispute which had erupted over it. The history, terms and purposes of the section indicate, and this Court concludes, that § 3(c)(1)(D) was effective upon its enactment on October 21, 1972.[11]

## II.

■ The second question before this Court is whether the offer of compensation required by § 3(c)(1)(D) may be tendered to the EPA with an application for registration in a general manner—that is, an offer to pay reasonable compensation to anyone whose data may be considered by the EPA in granting the application—or whether the offer must be made directly to the originator of the data.[12] In its Order of May 23, 1975, granting plaintiff's motion for preliminary injunction, this Court indicated its preliminary view that the offer must be made directly to the original applicant, and no evidence or argument has been presented since that date to alter that view.

§ 3(c)(1)(D) provides:

. . . . that data submitted in support of an application shall not, without permission of the applicant, be considered by the Administrator in support of any

---

**10.** See also *Dow v. Train*, 423 F.Supp. 1359, 1362 (E.D.Mich.1976).

**11.** § 4(c)(1), which provides that "[t]wo years after the enactment of this Act the Administrator shall have promulgated regulations providing for the registration and classification of pesticides under the provisions of this Act and thereafter shall register all new applications under such provisions," is not inconsistent with this interpretation. Regulations were required to establish the procedure for determining the

amount and method of compensation without regard to the portion of § 3(c)(1)(D) mandating an offer of reasonable compensation and prohibiting consideration of data without it.

**12.** The question of whether § 3(c)(1)(D) applies to *all* data submitted, regardless of date, or whether it is limited to data submitted on or after January 1, 1970 (as provided in the 1975 amendment), will be determined by the three-judge court.

other application for registration unless such other applicant shall have first offered to pay reasonable compensation for producing the test data to be relied upon . . . . If the parties cannot agree on the amount and method of payment, the Administrator shall make such determination and may fix such other terms and conditions as may be reasonable under the circumstances . . . .

The section contemplates a specific offer of compensation made by the subsequent applicant to the original applicant. Under its terms the Administrator enters the picture to determine what constitutes reasonable compensation only "If the parties cannot agree on the amount and method of payment"; clearly, in order for the parties to disagree, the original applicant must be aware of the subsequent applicant's offer and must have engaged in some degree of negotiating over the price.[13] Accord, *Dow v. Train, supra,* 423 F.Supp. at 1367.

The 1975 amendment to § 3(c)(1)(D) supports this conclusion. It states that "Registration shall not be delayed pending the determination of reasonable compensation *between the applicants,* by the Administrator or by the court." (Emphasis supplied.) Further, it appears that the Administrator may have come around to this viewpoint: the EPA has proposed regulations which would require a specific offer of compensation made by the subsequent applicant to the original applicant on whose data he relies. See proposed C.F.R. § 162.-9(b)(4)(iii), 42 Fed.Reg. 31288.[14]

### III.

Plaintiff seeks a declaration that certain registrations enumerated in plaintiff's complaint, issued after October 21, 1972, in reliance [15] on information, research, and test data developed and submitted by plaintiff without plaintiff's permission and without a specific offer of reasonable compensation made to plaintiff, were issued in violation of § 3(c)(1)(D) of FIFRA of 1972.[16] Defendant responds, in effect, that even if the provisions of § 3(c)(1)(D) were not met, it is impossible to unravel the past and inequitable to invalidate registrations granted on the basis of the agency's understandable misinterpretation of an unquestionably unclear statute. Defendant relies on the Congressional intent, expressed in the legislative history of Public Law 94–140, not to invalidate the thousands of reg-

13. Similarly, of course, in order to have granted permission for use of the data in support of another's application, as § 3(c)(1)(D) contemplates will sometimes occur, the original applicant must be aware of the subsequent application.

14. The Court notes with some frustration the argument presented by *amicus,* the Pesticide Formulators Association, that a specific offer of compensation cannot be made to the original submitter of data because there exists no central filing system by which a subsequent applicant may ascertain the identity of the original applicant. It does appear that there is a "Catch 22" to the statutory scheme. Nevertheless, this Court cannot require the EPA to maintain such an indexing system where Congress has not required it. Nor can the Court alter the obvious necessity of an offer to the original applicant merely because, as a practical matter, that offer may be difficult to make. The Court can only hope that the EPA voluntarily will facilitate registrations by implementing a central index system or that Congress, recognizing its omission, will mandate that one be maintained by the agency.

15. Defendant has stipulated that the issuance of a pesticide registration upon the basis of use patterns, efficacy and safety data previously established under FIFRA is tantamount to consideration by defendant of the research and test data on which such use patterns were established, and it is undisputed that the registrations of which plaintiff complains were granted on the basis of use patterns established on the basis of data submitted originally by plaintiff.

16. Plaintiff contends it is not seeking to invalidate any registrations; rather, it merely asks the Court to apply the provisions of § 3(c)(1)(D) to them. Defendant contends this is a "distinction without a difference," and the Court agrees. Plaintiff's brief "implores the Court to exercise its equity powers and enjoin the defendant from considering as valid and effective under FIFRA and FIFRA of 1972 the aforesaid registrations unless the defendant requires these registrants to offer to plaintiff reasonable compensation for the consideration and use of its data in support of their applications within such period of time as the Court in his discretion may determine reasonable."

istrations which the Administrator issued after October 21, 1972, pursuant to the Interim Policy Statement.[17]

It is true, as this Court has declared *supra,* that the provisions of § 3(c)(1)(D) should have been applied to any registrations granted by the Administrator on or after October 21, 1972. It is undisputed that certain registrations have been granted after October 21, 1972, in reliance on plaintiff's information or use patterns derived therefrom, without compliance with the terms of § 3(c)(1)(D). It is also true, under the statute and even under the terms of defendant's Interim Policy Statement, that any registrations granted without application of the § 3(c)(1)(D) provisions constituted registrations under the 1947 Act and those products must be "reregistered" under the requirements of FIFRA as amended.[18] The Administrator has indicated that, although it would be "administratively impossible" to require all of the 30,000 pesticide products requiring reregistration to satisfy the data requirements for new registration within the brief time provided, five year renewals of registration will be processed on a staggered basis and, upon renewal, the then current data requirements for new registrations will be applied to all products previously registered by the agency. 40 Fed.Reg. 28250.

As defendant points out, in considering the 1975 amendments to FIFRA, Congress recognized the dispute over the provisions of § 3(c)(1)(D) and the delay resulting from this and other litigation brought to resolve the dispute:

It is hoped that the amendment agreed to by the conference committee will enable the EPA to proceed expeditiously on the pending applications for registration. As noted in the report of the Senate Committee on Agriculture and Forestry, all pesticides must be reregistered under the 1972 amendments to FIFRA. *It is not the intent of the conferees that existing registrations are to be invalidated because the conference committee has determined that data submitted after January 1, 1970, is compensable and that the data compensation provision applies to all applications for registration and reregistration submitted after October 21, 1972. Rather, the reregistration process is about to commence and it is expected that data compensation under Section 3(c)(1)(D) will be provided, where appropriate, during the reregistration process.* Cong. Record, S. 20460, Nov. 19, 1975 (remarks of Senator Allen). [Emphasis supplied.]

While the legislative history thus expresses a Congressional desire to expedite the registration process by clarifying the provisions of § 3(c)(1)(D), it also clearly recognizes the need to permit registrations granted without regard to the compensation provisions of § 3(c)(1)(D) to exist pending the application of the statutory provisions upon reregistration of those products. Given the legitimate confusion which has surrounded the application of this statute, any other resolution would be manifestly unfair and unnecessary.

Applying the compensation provisions of § 3(c)(1)(D) upon reregistration of those products previously registered guarantees that plaintiff will receive compensation in connection with those products for which compensation is warranted without invalidating existing registrations and creating administrative havoc. Thus, although the registrations of which plaintiff complains were in fact granted in violation of the compensation provisions of § 3(c)(1)(D), Congressional recognition of the legitimate confusion concerning those provisions resulted in a clear expression of Congressional desire not to invalidate those improperly-

---

17. At issue herein are twenty-three registrations, enumerated in plaintiff's complaint, which allegedly were issued by defendant between March 1973 and February 1974, upon consideration by the Administrator of information, research and test data submitted by plaintiff without plaintiff's permission and without a specific offer to plaintiff to pay reasonable compensation for the use of the data relied upon.

18. The reregistration process was to have been completed by October 21, 1977.

granted registrations. See also S.Rep.No. 94–452, 94th Cong., 1st Sess., Nov. 10, 1975, U.S.Code Cong. & Admin.News 1975, p. 1359. In short, plaintiff will receive any relief to which it is entitled not immediately, but upon reregistration of the products registered under FIFRA of 1947.

### IV.

The next issue raised by plaintiff, and the primary issue around which the trial of this action revolved, is the question of the definition of "trade secret" as that term is utilized in § 10(b) of FIFRA of 1972, 7 U.S.C. § 136h(b). That section, entitled "Protection of trade secrets and other information," provides:

> Notwithstanding any other provision of this subchapter, the Administrator shall not make public information which in his judgment contains or relates to trade secrets or commercial or financial information obtained from a person and privileged or confidential, except that, when necessary to carry out the provisions of this subchapter, information relating to formulas of products acquired by authorization of this subchapter may be revealed to any Federal agency consulted and may be revealed at a public hearing or in findings of fact issued by the Administrator.

In addition to its obvious relevance to the disclosure provisions of § 3(c)(2), the trade secret definition applicable to § 10(b) also has significance to the compensation and consideration provisions of § 3(c)(1)(D), for that section provides that the Administration shall not, without permission, consider one applicant's data in support of another application unless the subsequent applicant has offered to pay reasonable compensation *and* "such data is not protected from disclosure by section 136h(b) of this title." [§ 10(b)]

 It is plaintiff's position that the definition of "trade secret" set forth in the Restatement of Torts, § 757, comment b (1939) is the definition intended by Congress to apply to § 10(b) of FIFRA of 1972, and that the applicability of that definition

to any given data submitted to the agency must be determined on a case by case basis. Defendant contends that § 10(b) must be read in connection with §§ 3(c)(1)(D) and 3(c)(2). Reading § 3(c)(1)(D) as a mandatory licensing provision, and § 3(c)(2) as requiring the disclosure of all test data, defendant concludes that section 10(b) creates, in effect, a narrow statutory definition of "trade secret" which provides only for the withholding of confidential formulae, manufacturing and quality control information, and information upon which applications are based for registrations which have not yet been approved. According to defendant, the definition of "trade secret" as that term is used in § 10 does not include data relating to safety or efficacy of a pesticide product. Both plaintiff and defendant contend that the legislative history of FIFRA supports their position.

This Court's review of the legislative history finds that it recognized and accepted the definition of trade secret set forth in § 757 of the Restatement of Torts. Accord, *Dow Chemical Co. v. Costle*, No. 76–10087 (E.D.Mich. Nov. 16, 1977). Comment b to that section states:

> *Definition of trade secret*: A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device, or a list of customers. It differs from other secret information as to single or ephemeral events in the conduct of the business, as, for example, the amount or other terms of a secret bid for a contract or the salary of certain employees, or the security investments made or contemplated, or the date fixed for the announcement of a new policy or for bringing out a new model or the like. A trade secret is a process or device for continuous use in the operation of the business. Generally it relates to the production of goods,

as, for example, a machine or formula for the production of an article. It may, however, relate to the sale of goods or to other operations in the business, such as code for determining discounts, rebates or other concessions in a price list or catalogue, or a list of specialized customers, or a method of bookkeeping or other office management.

The legislative history discusses the application of the "trade secret" definition at S.Rep.No. 92–838, 92d Cong., 2d Sess., pt. 2 (1972) at 72, U.S.Code Cong. & Admin.News 1972, pp. 3993, 4091:

> (1) Information that constitutes a trade secret, financial information which is privileged or confidential, or commercial information the disclosure of which gives a competitor a competitive advantage with respect to the proprietor of the information should be protected from disclosure except under those circumstances enumerated in subsection (c)(1).
>
> *General approval is given to the definition of "trade secret" as incorporated in the RESTATEMENT OF TORTS.* [Emphasis supplied.]
>
> In determining whether given matter constitutes a trade secret, consideration shall be given to—
>
> (a) the extent to which the data is independently known to outsiders or is used by outsiders for similar purposes;
>
> (b) the extent to which it is known by insiders;
>
> (c) the extent of the measures taken by an owner to guard its secrecy;
>
> (d) value of the data to the owner and others, including the extent to which, if used in conduct of the business, it would confer a competitive advantage on said owner;
>
> (e) the amount of effort or money expended on developing the data; and
>
> (f) the ease or difficulty with which the data could properly be acquired or duplicated by others.

Deliberation has been given to those circumstances under which it may be proper to release trade secrets. Those instances are set forth in subsection (c) of section 10. In all instances the disclosure shall be done in such a method as to guard the secrecy of the data as much as possible and insure it will not fall into the hands of a competitor.

This construction, incorporating the Restatement definition, also is consistent with the fact that the notion of trade secrecy arises from the common law, and expressed throughout the common law is the general view that the definition of "trade secret" is accurately set forth in Restatement of Torts. *Kewanee Oil Co. v. Bicron Corp.,* 416 U.S. 470, 474, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974); *Sandlin v. Johnson,* 141 F.2d 660 (8th Cir. 1944); *In re Consumers Union of United States, Inc.,* 27 F.R.D. 251, 254 (S.D.N.Y.1961). See *Dow Chemical Co. v. Costle,* Civil Action No. 76–10087 (Nov. 16, 1977).

The legislative history of FIFRA does not support defendant's position that all safety and efficacy data by definition are outside the protection of § 10(b). Nor do the statutory provisions of FIFRA support a construction which necessarily would require that all safety and efficacy data be disclosed. Both § 3(c)(1)(D) and § 3(c)(2) recognize that test data may be protected from disclosure under § 10(b). See *Chevron Chemical Co. v. Costle,* 443 F.Supp. 1024 (N.D.Cal.1977). Thus, contrary to defendant's position, the determination of whether data is to be considered a trade secret protected from disclosure under § 10(b) is to be made without regard to whether the data falls into the category of safety or efficacy data. Defendant may not escape a specific factual determination as to whether any given data is a trade secret by means of a general conclusion that safety or efficacy data is a matter of general knowledge in the scientific community, or that as a matter of policy it should be disclosed to the public. It is not the function of this Court to determine legislative policy. Congress has declared its policy by indicating its acceptance of the trade secret definition adopted in the Restatement of Torts; that definition requires weighing several factors

in determining whether any specific data is to be afforded trade secret status.[19]

This is not to say, however, that in weighing the various factors set forth in the Restatement definition, the same result might not be reached in many instances. For example, defendant correctly points out that one of the most significant factors involved in the Restatement definition of trade secret is that disclosure of the allegedly trade secret information would be likely to cause substantial harm to the owner's competitive position. Taking into account the compensation provisions of § 3(c)(1)(D), in many instances it might be concluded that the owner's competitive position would *not* be harmed by disclosure because the amount of compensation deemed reasonable for the use of the data would assure that the owner's competitive edge would be maintained. Another important factor to be considered in applying the Restatement definition is the extent to which the data is independently known to outsiders. Thus, in any instances where the specific methodology and protocols for specific compounds are well-known and widely-available, that data might properly be determined not to qualify for trade secret status. Similarly, if particular data could be easily duplicated by others, in certain circumstances that data might be determined not to constitute a trade secret. In compliance with the Congressional intention that the Restatement definition of "trade secret" apply, however, those determinations must be made on a case by case basis, weighing the data in light of the factors set forth by Congress, rather than on the basis of a pre-conceived, categorical definition of what types of data constitute trade secret material.[20]

Plaintiff next would have this Court declare, in light of the definition of "trade secret" identified herein, what portions of the information, research and test data submitted by plaintiff to the administering agencies contain or relate to trade secrets or commercial or financial information which is privileged or confidential within the meaning of § 10 of FIFRA of 1972. Most of the time consumed in the lengthy trial of this action consisted of plaintiff's attempt to illustrate that its information, research and test data meet each of the tests which constitute the Restatement definition of "trade secret." This Court accepts—in fact, defendant does not dispute—that plaintiff has spent millions of dollars and substantial time, effort, and expertise in the development of data in support of its applications for registration of pesticides.

**19.** The Court is aware that both Houses of Congress recently have passed amendments to § 10 of FIFRA which provide that all information concerning the objectives, methodology, results, or significance of any test or experiment performed on or with a registered or previously registered pesticide or its separate ingredients, impurities, or degradation products, and any information concerning the effects of such pesticide on any organism or the behavior of such pesticide in the environment shall be available for disclosure to the public. See S. 1678, 95th Cong., 1st Sess.; H.R. 8681, H.R.Rep. 95–663. While it may be true that these bills evidence a Congressional intent that this data be *disclosed,* it does not indicate that it is not trade secret data, particularly in view of the clearly-expressed adoption of the Restatement definition of trade secrets.

**20.** Defendant's arguments that Congressional policy reflected in FIFRA, in the Freedom of Information Act, 5 U.S.C. § 552, in the Toxic Substances Control Act, 15 U.S.C. § 2601 *et seq.,* favors public disclosure and augurs against a broad definition of trade secrets is appealing. However, that policy properly is the subject of a Congressional hearing rather than this Court proceeding. This Court must follow the policy adopted by Congress in its acceptance of the Restatement definition of "trade secret."

Similarly, although this Court might like to look favorably upon defendant's argument that a broad definition of trade secret enables large companies such as plaintiff to preclude smaller competitors from obtaining registrations by protecting data from disclosure, the power to remedy such a potential problem lies with Congress.

Defendant's contention that a case by case determination under the Restatement definition places an undue burden upon the agency is clearly without merit. The burden is upon the applicant seeking registration, rather than upon the agency. Again, any remedy for this alleged burden lies with Congress. See *Dow Chemical Co. v. Train, supra,* 423 F.Supp. at 1368.

Nor is it disputed that the information, research and test data developed by or for plaintiff and submitted by it is confidentially maintained by plaintiff. Except for efficacy data, this information is not disclosed generally except to the EPA and other governmental agencies pursuant to their regulatory requirements. Circulation of these reports among plaintiff's personnel is on a limited need-to-know basis and plaintiff's personnel execute secrecy agreements with respect to this information, research and test data.

■ Despite plaintiff's efforts to demonstrate to this Court that its information, research and test data qualify as trade secret,[21] the proper remedy in this instance is remand to the agency for its determination under the appropriate standard. Section 16(c) of FIFRA, 7 U.S.C. § 136n(c) provides this Court with jurisdiction " . . . specifically to enforce, and to prevent and restrain violations of, this subchapter." Accordingly, this Court has the power to require the Administrator to exercise his judgment under the proper legal standards as to which data is protected under § 10(b). The Court's determination as to whether or not information is protected from disclosure, however, is limited to information which has initially been considered by the Administrator.[22] In this case, where the Administrator has made no determination required by § 10(b) under the appropriate

legal standards, and plaintiff has had no opportunity to present before the agency evidence to support its contentions that certain of its information, research and test data constitute trade secrets, remand is required. *Dow Chemical Corp. v. Costle*, Civil Action No. 77–10087 (E.D.Mich. Nov. 16, 1977);[23] *Chevron Chemical Co. v. Costle, supra.*

## V.

Plaintiff next seeks the Court's declaration that the procedure adopted by the Administrator for implementing § 10(b) is unauthorized, invalid and void.

§ 10(b) provides:

Notwithstanding any other provision of this subchapter, the Administrator shall not make public information which in his judgment contains or relates to trade secrets or commercial or financial information obtained from a person and privileged or confidential . . . .

Specifically at issue here is the related provision of § 3(c)(2) that *except as provided by § 3(c)(1)(D) and § 10*, within thirty days after the Administrator registers a pesticide, he shall make available to the public the data called for in the registration statement together with such other scientific information as he deems relevant to his decision.

As discussed *supra*, defendant has implemented § 10(b) by mailing Notices of Deter-

---

**21.** The Court confesses that it remains somewhat confused by plaintiff's presentation at trial. It appears from the record that plaintiff's witnesses qualified *all* of plaintiff's information, research and test data under the criteria set forth in the Restatement definition. Then, well into the trial, plaintiff's counsel identified only certain categories of that data which plaintiff *claims* as trade secret. The basis for distinguishing that data from other data not claimed as trade secret was never made clear. Thus, although the Court is convinced that some of plaintiff's data undoubtedly is trade secret and some is not, the Court is without the means in this case to determine which is which.

**22.** Although § 16(c), 7 U.S.C. § 136n(c), provides the district court with jurisdiction specifically to enforce the provisions of FIFRA or to restrain violations of those provisions, subsection (a) of § 16 provides that "other final Agen-

cy actions not committed to Agency discretion by law are judicially reviewable in the district courts." Construing these sections together, it appears that § 10(c) provides authority to obtain judicial review of a final agency action not committed to agency discretion by law. Thus, the agency must make the initial factual determinations and an aggrieved party may bring an action for judicial review thereof. *Dow Chemical Co. v. Costle*, Civil Action No. 76–10087 (E.D.Mich. Nov. 16, 1977); see *Ciba Corp. v. Weinberger*, 412 U.S. 640, 643–44, 93 S.Ct. 2495, 37 L.Ed.2d 230 (1973); *Chrysler Corp. v. Schlesinger*, 565 F.2d 1172 (3d Cir. 1977).

**23.** On remand, plaintiff shall have the burden of identifying data it seeks to protect from disclosure. The Administrator is required to provide an adequate basis and reasons for his determination. *Id.*

mination to producers of pesticide products, informing them that in the opinion of the Administrator certain data which they have submitted—and ostensibly identified in an attachment to the Notice—is not protected from disclosure under § 10(b).[24]

The Notices state, in pertinent part:

. . . 4. Due to constraints on Agency resources, EPA has not screened the contents of the records listed in Attachment A to locate, within those records any information which may fall within paragraphs 3A, 3B or 3C of this Notice [listing information entitled to confidential treatment as that (A) which relates to confidential formulae, (B) manufacturing process or quality control information, or (C) to data submitted in support of an application which has not yet been granted.] Your firm may be aware that such information is contained within the listed records.

5. EPA now desires to establish with finality whether the records listed in Attachment A may be made available to the public.

6. You are hereby notified that except as set forth in paragraph 7 of this Notice, EPA intends to make public all records listing in Attachment A on the 31st calendar day after your receipt of this Notice (the 'disclosure date') unless you have first notified EPA that you have instituted an action under section 10(c) of FIFRA, in an appropriate Federal district court, for a declaratory judgment as to whether those records are entitled to protection under section 10(b) of FIFRA, and for preliminary injunctive relief.

7. If your firm furnishes to EPA, before the 'disclosure date,' a statement in the form described by paragraph 8 of this Notice asserting that portions of the records listed in Attachment A are [entitled to confidential treatment], EPA will not disclose those portions of the records on the 'disclosure date.' In that case, a further confidentiality determination with respect to those portions of the records will be made by EPA, and your firm will be afforded a further period to seek judicial review of a determination adverse to you.

8. Any statement you may wish to submit . . . must be in writing . . . and, with respect to each item of information you allege to be entitled to confidential treatment, must set forth the following:

A. A description of the information, and its location within the record;

B. The category . . . which, in your opinion, describes the item of information;

C. The period for which you desire confidential treatment (e. g., permanently, until a certain date, or until the occurrence of a specific event);

D. The measures you have taken to guard against undesired disclosure of the information to others;

E. The extent to which the information has been disclosed (or is available) to others, and the precautions you have taken in connection with any such disclosure; and

F. How disclosure of the item of information would be likely to cause substantial harm to your competitive position.

According to plaintiff, the Administrator has a statutory duty to exercise his judgment as to which materials submitted to him fall within the protection of § 10(b). Plaintiff contends that rather than accepting the responsibility placed upon him by

---

24. Many of the Notices received by plaintiff contain no materials designated as the attachment. Accompanying many of the Notices are copies of the front pages of pesticide registration application brochures and pesticide petitions, copies of tables of contents from brochures containing numerous reports, and copies of the front pages of reports or of the report itself. Often defendant's handwritten notation states, "please consider the entire petition," apparently to indicate that in these instances defendant considers that an entire multi-volume submission is subject to the notice of intended disclosure. The EPA now is computerizing its 10(b) Notice mailings and intends ultimately to send Notices relating to all of the information, research and test data contained in its files.

the statute, the Administrator has used a "blanket abdication of his responsibility," in the form of the 10(b) Notices, justified only by "administrative convenience." Plaintiff asserts that, in adopting § 10(b), Congress intended disclosure of only a limited amount of data, only *after* registration, and only if the rights of the applicant are protected—not the wholesale disclosure attempted by defendant. According to plaintiff, the method adopted by the Administrator places an unwarranted burden on the producers of data and, in view of the requirement that a suit for injunctive relief be instituted to prevent disclosure,[25] on the federal district courts.

Defendant contends, however, that he did exercise his "judgment" with respect to disclosure of the alleged § 10(b) data, and concluded that no hazard or efficacy data is protected by § 10(b). Defendant admits that he did not review each page, item or volume of the data submitted to him by plaintiff prior to issuing the Notices of Determination because, under his interpretation of his duties, he is required to disclose hazard and efficacy information. According to the Administrator, the burden of identifying § 10(b) data properly is placed upon the producer of the data because even if the Administrator were to screen each item of data submitted, there would be no assurance that he would locate all information which the producer deems important; the producer reasonably may be expected to be aware of the existence and location of its own trade secret and privileged materials. Defendant contends that giving notice to plaintiff that disclosure is imminent, and permitting plaintiff the opportunity to challenge disclosure by demonstrating the confidentiality of the data subject to the notice, and to obtain judicial review of an adverse determination, provide plaintiff all the procedural protection required by law.

■ This Court agrees with plaintiff that some of the procedures adopted by the Administrator to implement § 10(b) violate the statute. § 10(b) does require the Administrator to exercise his judgment as to whether information submitted by plaintiff contains or relates to trade secrets or privileged commercial or financial information; the statutory language—"contains or relates to"—does contemplate a *specific* determination with respect to specific data or information which plaintiff submits, rather than a blanket determination as to general *types* of information or data. It is no answer for defendant to contend that a remand would be futile because he already has exercised his judgment in determining that no safety or efficacy data is subject to the protection of § 10(b), for the Administrator has reached that determination at least in part on the basis of an incorrect legal standard as to what information qualifies as a trade secret.[26] Because that determination must be made prior to any decision whether or not to disclose information, and must be made on the correct legal standard defining trade secret (§ 757 of the Restatement of Torts), a remand is required.

■ Plaintiff also is correct in asserting that § 3(c) contemplates only *post*-registration disclosure of data which is determined not entitled to § 10(b) protection. That subsection provides for disclosure of data relied upon by the Administrator in determining to grant an application for registration, and provides for disclosure "within thirty days *after the Administrator regis-*

**25.** See § 2.307(e)(3) of defendant's disclosure regulations, 41 Fed.Reg. 36902–36942. Plaintiff characterizes the 10(b) Notices as threatening disclosure even after suit is instituted unless preliminary injunctive relief is *obtained.* This Court finds no such "threat" in defendant's Notice. Rather, the Notice states that disclosure will occur unless the EPA is notified that a suit for preliminary injunctive relief has been *instituted* in an appropriate federal district court.

**26.** The notices sent by defendant soliciting demonstration that information subject to the notice is entitled to confidential treatment reflect application of the Administrator's faulty "trade secret" definition—they request only a showing that the information relates to chemical formulae, manufacturing or quality control methods, or data submitted in support of an application for registration which has not yet resulted in the issuance of a registration.

ters a pesticide." 7 U.S.C. § 136a(c)(2) [Emphasis supplied.]

■ Plaintiff's assertion that defendant unduly burdens data producers such as plaintiff by requiring them to obtain preliminary injunctive relief in order to prevent the threatened disclosure is without merit. No such requirement is imposed by defendant. As explained in the Notice, the regulations implementing § 10 merely require that within thirty days of receipt of a Notice of Determination, the data submitter must file an action in an appropriate United States District Court for declaratory and injunctive relief. 40 C.F.R. 2.205(f)(2); 2.307(d); 2.307(e)(3). If the action is filed, the Administrator will not release the data for inspection. Although § 10(c) of FIFRA provides that within thirty days after notice, a data producer "*may* institute an action . . . ," § 10(c) does not require that the Administrator withhold disclosure following the thirty day period even though such an action is filed. Thus it appears that the Administrator's requirement that an action be filed in order to prevent disclosure on the 31st day falls within the Administrator's authority to implement the provisions of the Act. See *Dow Chemical Co. v. Costle, supra.*

## VI.

The next allegation which plaintiff raises is that the Administrator is violating § 4(c)(2) of FIFRA by applying different and lesser requirements for reregistration of pesticides previously registered than are being imposed for registration of new pesticides. According to plaintiff, full compliance with the current registration requirements is mandated by statute for reregistrations as well as for new registrations.

It is true that the regulations promulgated by the Administrator, on the basis of "administrative convenience," did establish different requirements for reregistrations than for registration of new pesticides. See 40 C.F.R. § 162 (1976). However, in the case of *Dow Chemical Co. v. Costle*, No. 76–10087 (E.D.Mich.1977), defendant has consented to a judgment declaring that the statute mandates the same data requirements for reregistration as for new registrations, and has agreed to modify 40 C.F.R. § 162 accordingly. For that reason, although plaintiff correctly asserts that standards for registration and reregistration should be the same, this issue before this Court is moot.

## IX.

Finally, plaintiff contends that the Administrator's practices with respect to supplemental registrations are arbitrary, capricious, and not in accordance with law. The issue is whether or not a supplemental registrant who is under contract with an original registrant may manufacture, formulate, or package the product for which it has a supplemental registration.

Authority for the granting of supplemental registrations has existed in FIFRA since its enactment in 1947, and is provided in § 3(e) of FIFRA of 1972 as follows:

> *Products with same formulation and claims.* Products which have the same formulation, are manufactured by the same person, the labeling of which contains the same claims, and the labels of which bear a designation identifying the product as the same pesticide may be registered as a single pesticide; and additional names and labels shall be added to the registration by supplemental statements.

The Agency's regulations under FIFRA of 1972 relating to supplemental registration, found at 40 C.F.R. § 162.6(b)(4) (1976), provide:

> *Application for Supplemental Registration of Distributor Products.* Supplemental registration permits a distributor of a registered pesticide product to market that pesticide product under the distributor's brand name. An application for supplemental registration of distributor brands may be submitted by a registrant of a previously registered product or by an applicant for new or amended registration provided, however, that no application for supplemental registration will be approved until the application for new registration has been approved.

(i) *Conditions for Supplemental Registration of Distributor Products.*

(A) The product must have the same composition as the previously registered product.

(B) The product must be manufactured and packaged by the same person who manufactures and packages the previously registered pesticide product.

(C) The product labeling must bear the same claims as the previously registered product; provided, however, that specific claims may be deleted if by so doing no other changes are made necessary.

(D) The pesticide formulation must remain in the manufacturer's unbroken container.

(E) The label must bear the registration number of the previously registered product.

(F) The EPA distributor number must appear as a suffix to the registration number.

(G) Distributor products must bear the name and address of the distributor qualified by such terms as 'packed for . . .'; 'distributed by . . .'; or 'sold by . . .' to show that the name is not that of the manufacturer.

(H) All conditions of the previous registration apply equally to the supplemental registration.

The Administrator's comments concerning this section of the regulations appear at 40 Fed.Reg. 28257 (July 3, 1975):

Several commentators argued that the regulations concerning supplemental registration are too stringent. They misunderstand the purpose of supplemental registration. The Agency merely intends to allow the marketing of a pesticide product under a distributor brand name. The distributor is not empowered to formulate, package or otherwise manufacture the pesticide product. The requirements for supplemental registration are designed to insure the pesticide product is not adulterated.

In addition to the provisions of § 3, which require registration (and supplemental reg-

istration, where applicable) of a pesticide prior to its transportation in intra- or interstate commerce, § 7 of FIFRA, 7 U.S.C. § 136e, requires registration of the establishments where pesticide products are produced:

(a) No person shall produce any pesticide subject to this subchapter in any State unless the establishment in which it is produced is registered with the Administrator. The application for registration of any establishment shall include the name and address of the establishment and of the producer who operates such establishment.

There is no exception to the § 7 provision that all establishments producing pesticides for intra- or interstate commerce be registered. The § 3 requirement for registration of the pesticide itself prior to its transportation in commerce does have exceptions, which are set forth at § 3(b)(1) in part as follows:

(b) Exemptions.—A pesticide which is not registered with the Administrator may be transferred if—

(1) The transfer is from one registered establishment to another registered establishment operated by the same producer solely for packaging at the second establishment or for use as a constituent part of another pesticide produced at the second establishment . . . . .

The regulations dealing with this section of the Act explain this first exemption as follows:

The term "operated by the same producer" means (1) another registered establishment owned by the registrant of the pesticide product or (2) another registered establishment operated under contract with the registrant of the pesticide either to package the pesticide product or to use the pesticide as a constituent part of another pesticide product, provided that the final pesticide product is registered by the transferor establishment.

40 C.F.R. § 162.3(dd).

In his comments to the regulations implementing § 3(b)(1), the Administrator states, at 40 Fed.Reg. 28426 (July 3, 1975):

. . . The Agency believes that much of the comment to this Section was generated by confusion as to the meaning of the term "operated by the same producer." Accordingly, the term has been defined at Section 162.3(dd). An establishment operated by the same producer includes one owned by the registrant of the pesticide product and one operated under contract with the registrant of the pesticide product either to package the pesticide product or use the pesticide as a constituent part of another pesticide product, provided that the final pesticide product is registered by the transferor establishment. The proviso clause of this term is very important. It is not enough that the contract relationship exists between the parties. The transferor establishment must be the one that holds the registration of the final pesticide product. The Agency believes that Congress in its use of the term "operated by the same producer," has recognized the common business practice among registrants of contracting for the packaging or formulation of pesticide products.

(b) Many questions have arisen concerning the scope of Section 3(b)(1) of the Act and § 162.5(b)(1) of these regulations. A pesticide product, when transferred from one registered establishment to another registered establishment, operated by the same producer for the purposes indicated above, is exempt from the registration requirements of the Act. It must, however, be labeled so as to meet the other requirements of the Act . . .

Defendant views the above statutory provisions as establishing two separate forms of registration—one for the registration of facilities or establishments involved in the production of pesticides (§ 7), and the other for the registration of the pesticides themselves (§ 3). Registration under § 3 is further divided into the full registration available under § 3(c), and the limited "supplemental" registration available under § 3(e). Under certain circumstances, set forth in § 3(b)(1), the pesticides need not be registered. Defendant and plaintiff agree that the statute permits supplemental registrants to distribute pesticide products under their own label, and that a supplemental registration does not permit supplemental registrants, as such, to produce or package pesticide products. Supplemental registration merely permits the registrant to market under its own brand name pesticides produced and packaged by the base registrant.

 However, defendant views § 3(b)(1) as providing certain circumstances in which parties under contract to base registrants may produce, package, and/or distribute pesticide products. Defendant reaches this conclusion by construing the exemption from registration provided in § 3(b)(1) for transfers between establishments "operated by the same producer" to include transfers to firms under contract with the base producer to package the product or to use the pesticide as a constituent part of another product—provided the pesticide is first registered by the transferor establishment and both establishments are registered with the Administrator. According to defendant, this construction merely recognizes the common industry practice of contracting for the performance by other firms of various component activities within the production process. See 40 C.F.R. § 162.3(dd); 40 Fed.Reg. 28246. Under this arrangement, the transferee establishment must adhere to the restrictions and requirements of the underlying pesticide registration, and the base registrant must bear responsibility for the proper performance of its contractor.

Defendant contends that its definition of the term "operated by the same producer," which is not defined in the statute, is reasonable and constitutes a legitimate exercise of his statutory authority to implement the Act. 7 U.S.C. § 136w. Defendant also interprets the § 3(b)(1) exemption as applying to any establishment, including one possessing a supplemental registration, which meets its terms—that is, if a registered firm (Firm B) which has a supplemental registration to distribute a pesticide product also contracts with the base registrant (Firm A) to package that product or to use

the pesticide as a constituent part of another pesticide product, then according to defendant, the exemption of § 3(b)(1) applies by virtue of the contract, and Firm B is entitled to engage in the kinds of activities which other such contractors may carry on. The product already has been registered by Firm A, which remains responsible for its packaging and/or production by Firm B. It need not again be registered under § 3(c)(1)(D). According to defendant, the authority of Firm B to package or produce the pesticide product derives not in the slightest from the fact that Firm B has a supplemental registration to distribute the product, but from the fact that it has contracted with Firm A to package or produce the product and thus Firm B is "operated by the same producer."

Plaintiff, on the other hand, contends that the Administrator has grafted the provisions of § 3(b)(1) and § 3(e) with the intent and effect of "totally emasculat[ing] Section 3(c)(1)(D) and its provision for compensation." According to plaintiff, the Administrator's interpretation permits a firm which has obtained any number of "me-too" registrations prior to the effective date of or without application of § 3(c)(1)(D), and thus never has paid reasonable compensation, or any compensation, to the registrants who supplied the data necessary to support those registrations, to "proliferate those registrations ad infinitum by supplementally registering every other domestic and foreign manufacturer to produce and market those pesticides in competition with the primary registrants." Accordingly, plaintiff seeks an Order permanently enjoining the Administrator from issuing supplemental registrations to persons who manufacture, formulate or package the pesticide product for which they seek supplemental registration.

Having carefully considered the arguments of plaintiff and defendant, as well as the applicable sections of the Act, the regulations, and comments thereto, this Court finds and concludes that defendant's policies with respect to the activities permitted supplemental registrants are not wrongful, and constitute a legitimate exercise of his statutory authority. The provisions of FIFRA clearly contemplate the possible performance of different aspects of the production process at separate facilities, and § 3(b)(1) exempts from registration pesticides transferred from one registered facility to another registered facility operated by the same producer for certain purposes. The Act does not define the terms "operated by the same producer." It certainly does not require that the second establishment be *owned* by the same producer. In view of the industry practice—undisputed by plaintiff—of contracting for the performance of certain functions within the production process, the Administrator's definition which encompasses that practice certainly appears reasonable and well within his legitimate authority in implementing the statute.[27] See *Unemployment Comm'n v. Aragon*, 329 U.S. 143, 153, 67 S.Ct. 245, 91 L.Ed. 136 (1946).

Neither does anything in FIFRA preclude a single establishment from simultaneously engaging in those activities independently permitted to be undertaken by supplemental registrants and by parties under contract to base registrants. Plaintiff has set forth no ground, either in the language or underlying purposes of FIFRA, to support its position that a party who obtains a supplemental registration under § 3(e) should, solely by virtue of that fact, be precluded from engaging in the production-type activities permitted all other firms who are under contract to base registrants.

Contrary to plaintiff's view, this Court finds no conflict between the Administrator's interpretation of the activities permissible to supplemental registrants and the provisions of § 3(c)(1)(D). As defendant

---

**27.** As defendant points out, while the Act prohibits any production by an unregistered establishment, and also prohibits non-exempted sale or distribution of unregistered pesticides, it does not bar the mere *production* of unregistered pesticides at a registered establishment, even where such establishment is not operated by the base registrant of the particular pesticide.

points out, § 3(c)(1)(D) was designed in part to protect the investment of the original applicant in the development of the data necessary for pesticide registration by providing mandatory licensing of such data and compensation for its use where it is relied upon in granting of a "me-too" application. But FIFRA was not intended to shelter pesticide registrants from the rigors of commercial competition. The protection afforded by § 3(c)(1)(D) extends only to compensation for producing the test data used in the registration process, and not to the ultimate economic or commercial benefits which may flow from the registration itself. See H.Rep.No.94–497, 94th Cong., 1st Sess. 65 (1975); S.Rep.No.92–970, 92nd Cong.2d Sess. 12 and 12013 (1972) U.S.Code Cong. & Admin.News 1972, pp. 3993, 4092 (conclusions of Senate Committee on Commerce and letter of then-Acting Attorney General Kleindienst); Cong.Rec. 32, 257 (Sept. 26, 1972) (remarks of Senator Allen). Once the application requirements have been satisfied and the pesticide registered, FIFRA makes no distinction between the original and the subsequent or "me-too" applicant. Either is free to supplementally register another establishment to distribute its product. Either may make contractual arrangements for production of its registered pesticide.[28] The statute simply does not prohibit contracting for production by anyone as long as the producer registers its establishment under § 7. The only compensation which the statute provides the original applicant is that to which it is entitled due to reliance on its data in granting of a "me-too" registration; supplementary registrations and contracts for production simply are not occurrences for which compensation is provided.

Nor does the Administrator's interpretation pose the environmental horrors plaintiff postulates. In addition to the fact that the firms contracting with base registrants themselves will be subject to the registration, reporting, and inspection provisions of

§§ 7, 8, and 9 of FIFRA, 7 U.S.C. § 136e, § 136f, and § 136g, contractors, including supplemental registrants who are contractors, must produce the pesticide in strict accordance with the product composition specified in the base registration or subject themselves to sanction under § 12(a)(1)(C), 7 U.S.C. § 136j(a)(1)(C). See § 14, 7 U.S.C. § 136l. Further, the Administrator possesses broad enforcement authority under §§ 6 and 13, 7 U.S.C. §§ 136d and 136k, to protect the public from risk by withholding or removing a pesticide product from the market or cancelling the underlying registration itself. That authority in no way is diminished by allowing production activity by parties under contract to base registrants, even if they are supplemental registrants as well.

In addition to the absence of the detrimental effects asserted by plaintiff, the Administrator's policy accommodates the common business practice of enlisting by contract additional production and distribution resources in the process of moving pesticide products into commerce. It also may have the beneficial effects of enhancing competition within the pesticide industry by permitting smaller firms not holding registrations of their own under § 3(c) to engage in the production process, and increasing the availability of pesticide products to consumers by expanding the industry's production and distribution capacity.

For all the foregoing reasons, therefore, it is hereby

ORDERED and declared that the effective date of § 3(c)(1)(D) of FIFRA, as amended, 7 U.S.C. § 136a(c)(1)(D), and § 10 of FIFRA, as amended, 7 U.S.C. § 136h, is October 21, 1972; and it is further

ORDERED and declared that the term "trade secret" as utilized in § 10 of FIFRA, as amended, means " . . . any formula, pattern, device or compilation of information which is used in one's business, and

---

**28.** Ironically, nothing prevents plaintiff from seeking its own supplemental registrations, enabling its distributors to expand the market for its products, or from contracting with other

establishments for the formulation of its pesticides and thereby increasing its own productive capacity.

which gives him an opportunity to obtain an advantage over competitors who do not know or use it," Restatement, Torts, Section 757, Comment b (1939), taking into account those factors set forth in the Restatement of Torts and in Senate Report 92–838 (Part ii), 92d Cong., 2d Sess., p. 72; and it is further

ORDERED that the portion of this action involving the question of which portions of the information, research and test data submitted by plaintiff in support of applications for registration or tolerances contain or relate to trade secrets or commercial or financial information which is privileged or confidential be, and it is hereby, remanded to the Administrator of the Environmental Protection Agency for his determination under the proper legal standard set forth herein; and it is further

ORDERED and declared that § 3(c)(1)(D) of FIFRA, as amended, precludes defendant, without the prior permission of plaintiff, from considering in support of another's application for registration any information, research and test data submitted by plaintiff to the Administering Agencies on or after January 1, 1970, which does not contain or relate to trade secrets or commercial or financial information which is privileged or confidential unless such other applicant shall first have made a valid and binding offer to plaintiff to pay reasonable compensation to plaintiff for producing such data; and it is further

ORDERED and declared that defendant violated § 3(c)(1)(D) of FIFRA, as amended, by issuing the pesticide registrations described in paragraphs 30 through 38 of plaintiff's complaint; and it is further

ORDERED and declared that the pesticide registrations enumerated in paragraphs 30 through 38 of plaintiff's complaint are valid *de facto* registrations pending their reregistration under the present requirements of § 3(c)(1)(D); and it is further

ORDERED and declared that the provisions of defendant's "Interim Policy Statement" and "Modified Interim Policy Statement" are invalid and void only insofar as expressly set forth herein; and it is further

ORDERED and declared that certain of the procedures adopted by defendant for implementing § 10(b) of FIFRA of 1972, 7 U.S.C. § 136h(b) are invalid, void, and not in accordance with law for the reasons set forth herein; and it is further

ORDERED that defendant, his officers, agents, employees and representatives be, and they are hereby, forever and permanently enjoined from considering or using any information, research and test data submitted by plaintiff to the Administering Agencies on or after January 1, 1970, which contains or relates to trade secrets or other confidential or privileged commercial or financial information in support of any application for registration in which an applicant seeks to rely on such data until such time as defendant shall have obtained the express written permission of plaintiff; and it is further

ORDERED that defendant, his officers, agents, employees and representatives be, and they are hereby, forever and permanently enjoined from considering or using any information, research and test data submitted by plaintiff to the Administering Agencies on or after January 1, 1970, which does not contain or relate to trade secrets or other confidential or privileged commercial or financial information in support of any application for registration in which an applicant seeks to rely on such data until such time as the Administrator shall have obtained the express written permission of plaintiff or the subsequent applicant shall first have made to plaintiff a valid and binding offer to pay reasonable compensation to plaintiff for use of the data; and it is further

ORDERED that defendant, his officers, agents, employees and representatives be, and they are hereby, forever and permanently enjoined from implementation of the § 10(b) Notice procedure until such time as defendant shall have exercised his judgment as required in 7 U.S.C. § 136h(b), and in a manner consistent with this Opinion; and it is further

ORDERED that defendant, his officers, agents, employees and representatives be, and they are hereby, forever and permanently enjoined from reregistering under FIFRA, as amended, pesticides previously registered under FIFRA of 1947, by applying different or lesser standards than those upon which new pesticides are registered under FIFRA of 1972, as amended; and it is further

ORDERED that plaintiff's request for declaratory judgment that defendant's procedures regarding supplemental registrations violate §§ 3(c)(1)(D) of FIFRA, as amended, § 3(e) and § 10 and are therefore invalid and void, and for injunctive relief against enforcement of that procedure, be, and it is hereby, denied; and it is further

ORDERED that plaintiff's request for a declaration that § 2.307(e)(3) of defendant's disclosure regulations is invalid and void, and for injunctive relief against enforcement of that regulation, be, and it is hereby, denied.