**CHEVRON CHEMICAL COMPANY, Appellant,**

v.

**Douglas M. COSTLE.**

**No. 80–2037.**

United States Court of Appeals, Third Circuit.

Argued Nov. 6, 1980.

Decided Feb. 4, 1981.

As Amended Feb. 19, 1981.

Rehearing and Rehearing In Banc Denied March 3, 1981.

---

Richard J. Abrams, Stephen E. Herrmann, Richards, Layton & Finger, Wilmington, Del., Noble K. Gregory (argued), Brian D. Bellardo, Pillsbury, Madison & Sutro, San Francisco, Cal., for appellant Chevron Chemical Co.

Angus Macbeth, Acting Asst. Atty. Gen., Land and Natural Resources Div., Donald W. Stever, Jr., Chief, Pollution Control Section, Stephen D. Ramsey, Anne S. Almy, Patrick J. Cafferty, Jr. (argued), Attys., Dept. of Justice, Washington, D.C., for appellee.

Before GIBBONS and WEIS, Circuit Judges and WHIPPLE, District Judge.*

### OPINION OF THE COURT

GIBBONS, Circuit Judge.

Chevron Chemical Company (Chevron) appeals from an order of the district court denying its motion for a preliminary injunction and granting the motion of the defendant, Douglas M. Costle, Administrator of

---

* Hon. Lawrence A. Whipple, United States District Judge for the District of New Jersey, sitting by designation.

the United States Environmental Protection Agency (EPA). Chevron's amended complaint alleges that EPA possesses test data submitted by it in order to obtain registration for sale in interstate commerce of the pesticide naled and fungicide paraquat, and seeks preliminary injunctions prohibiting that agency from using such data submitted by Chevron "before, on, or after January 1, 1970" in ruling on applications for registrations for sale of chemically identical pesticides made by other manufacturers. The district court concluded that EPA was entitled to judgment as a matter of law. We affirm, although on grounds somewhat different from those the district court relied on, 499 F.Supp. 732.

## I.

More than nineteen years ago Chevron obtained patents on a pesticide, naled, and a fungicide, paraquat. Both are chemical compounds effective in controlling fungus and insect damage in agricultural products. Those patents expired in February, 1978, and thus the right to make, use and sell naled and paraquat became a part of the public domain. When the compounds were patented, however, the issuance of patents did not confer on Chevron the right to sell those compounds in interstate commerce for agricultural use. Federal law has regulated the sale in interstate commerce of agricultural fungicides and pesticides since the passage of the Insecticide Act of April 26, 1910, c. 191, 36 Stat. 335. In 1947 more stringent regulations were adopted, requiring registration of such compounds prior to sale in interstate commerce, and requiring, as a condition to registration, that the applicant submit test data to demonstrate to a federal regulatory agency the product's safety and efficacy. Federal Insecticide, Fungicide and Rodenticide Act of June 25, 1947, c. 125 §§ 2–13, 61 Stat. 163–72; 7 U.S.C. § 135 et seq., *superceded by* 7 U.S.C. § 136 et seq. Originally the registration function was housed in the Department of Agriculture, and later in the Food and Drug Administration, but in 1970 that function was transferred to EPA, 35 Fed.Reg. 15623 (1970).

Beginning in 1955 and continuing to 1979, Chevron submitted to EPA and its predecessor agencies test data supporting its applications for registration of naled. Beginning in 1966 and continuing through 1980, Chevron submitted to those agencies test data supporting its application for registration of paraquat. Both were approved as safe and effective, and have been sold by Chevron and its licensees in interstate commerce in substantial quantities.

The test data submitted to the federal agencies involving the results of metabolism, toxicity, efficiency, and tolerance testing on plants and animals, required expenditures by Chevron in excess of $1 million, and all of it, except to the extent it was submitted to those agencies, has been maintained in confidence. Indeed, according to Chevron, development of the information required to demonstrate safety and efficacy may be more costly than the research leading to development of the patented chemical compounds. Thus, as between it and its competitors, Chevron takes steps to treat the test data as trade secrets.

Prior to October 21, 1972, the only federal statute governing treatment of submissions of confidential information to the federal government pursuant to federal regulatory schemes was the Trade Secret Act, 18 U.S.C. § 1905, which provides:

Whoever, being an officer or employee of the United States or of any department or agency thereof, publishes, divulges, discloses, or makes known in any manner or to any extent not authorized by law any information coming to him in the course of his employment or official duties or by reason of any examination or investigation made by, or return, report or record made to or filed with, such department or agency or officer or employee thereof, which information concerns or relates to the trade secrets, processes, operation, style of work, or apparatus, or to the identity, confidential statistical data, amount or source of any income, profits, losses, or expenditures of any person, firm, partnership, corpora-

tion, or association; or permits any income return or copy thereof or any book containing any abstract or particulars thereof to be seen or examined by any person except as provided by law; shall be fined not more than $1,000, or imprisoned not more than one year, or both; and shall be removed from office or employment.

Thus it can fairly be said that when, prior to October 21, 1972 Chevron submitted data in support of its naled and paraquat registrations, it did so in the expectation that its trade secrets would not be published, divulged, or disclosed. Section 1905 does not, however, deal with agency use of submitted data for its own purposes. The question of agency use did not arise with respect to the naled and paraquat data prior to 1972, however, because Chevron held patents prohibiting others from making, using or selling the compounds as agricultural fungicides or pesticides.[1]

■ In 1972 Congress enacted the Federal Environmental Pesticide Control Act of 1972. Pub.L. 92–516, 86 Stat. 973. This legislation reenacted the registration requirements of the 1947 law and its subsequent amendments, but in the interest of environmental protection provided more stringent test data submission requirements. The lobbying battle over this legislation was intense, and among the features which aroused perhaps the most serious controversy was that embodied in section 3(c)(1)(D):

> . . . If requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, except that data submitted in support of an application shall not, without permission of the applicant, be considered by the Administrator in support of any other application for registration unless such other applicant shall have first offered to pay reasonable compensation for producing the test data to be relied upon and such data is not protected from dis-

closure by section 10(b). If the parties cannot agree on the amount and method of payment, the Administrator shall make such determination and may fix such other terms and conditions as may be reasonable under the circumstances. The Administrator's determination shall be made on the record after notice and opportunity for hearing. If the owner of the test data does not agree with said determination, he may, within thirty days, take an appeal to the federal district court for the district in which he resides with respect to either the amount of the payment or the terms of payment, or both. In no event shall the amount of payment determined by the court be less than that determined by the Administrator; . . .

This section did not authorize disclosure of registrant submissions, but for the first time required that if the agency were to consider the contents of its own files in support of another manufacturer's application for registration, it must make the new applicant pay "reasonable compensation" to the earlier applicant, whether or not the compound in question was protected by a patent. Section 3(c)(1)(D) of the 1972 Act must be read with section 10(a) of the same act, which allows an applicant to mark which part of the submitted data it considered trade secrets, and with section 10(b) which prohibits EPA from disclosing such trade secrets except as necessary to carry out its statutory duties. *See* 7 U.S.C. § 136h. The 1972 version of section 3(c)(1)(D) excludes from the use and compensation provisions all section 10(b) data.

Section 3(c)(1)(D) of the 1972 Act represents a compromise of what was originally enacted by the House of Representatives. As there proposed, the bill provided that

> . . . if requested by the Administrator, a full description of the tests made and the results thereof [shall be supplied to the EPA], except that data submitted in support of an application shall not, without the permission of the applicant be con-

---

1. Conceivably there are registrations of common unpatentable chemicals or chemical compounds whose registrations were supported by

the submission of confidential test data, but this record does not present such a case.

sidered by the Administrator in support of any other application for registration. H.R. 10729 § 3(c)(1)(D). H.Rep.No.92–511, 92d Cong. 1st Sess. at 17 (1971). The effect of the 1972 House Bill was to permit an initial applicant to determine on its own what it considered to be trade secrets, and to require that the Administrator abide by that determination. Thus the Administrator would have been obliged to ignore the contents of the agency files establishing that a new entrant's compound was both safe and efficacious unless the new entrant duplicated those contents or obtained consent from the old registrant. This would have been true not only of compounds developed by the original applicant, but even of common chemicals in the public domain.

The House provision received severe criticism by some members of the House Agriculture Committee, who pointed out that it would give initial applicants a quasi-patent of indefinite duration, would present a substantial bar to entry upon the expiration of patents, and was anticompetitive.[2] Efforts to delete the exclusive use provision by amendment on the House floor were offered and defeated. 117 Cong.Rec.H. 10677–78 (Nov. 8, 1971); H. 10733–40 (Nov. 9, 1971).

In the Senate the Agriculture and Forestry Committee supported the House bill's exclusive use provision, while the Commerce Committee opposed it vigorously, proposing an amendment to strike it.[3] The latter Committee invited comments from the Department of Justice, and from academic antitrust scholars. Acting Attorney General Kleindienst opposed the exclusive use provision as anticompetitive,[4] as did a number of law professors.[5] EPA also criticized the exclusive use provision.[6] Responding to the criticism from the Commerce Committee and elsewhere, the Agriculture and Forestry Committee, relying

---

2. *See* remarks of Congressman Foley, H.Rep. No.92–511, 92d Cong., 1st Sess. at 69 (1971); remarks of Congressman Dow, *id.* at 72.

3. The amendment of the Committee on Commerce strikes [the exclusive use] language, and allows the use of such data. Without the proposed amendment, the committee feels that barriers to entry in the pesticides industry would result which go far beyond that envisioned by our patent system. In effect, whether or not a pesticide has patent protection, a manufacturer wishing to register a pesticide previously registered would have to duplicate the required test data. As patent protection is granted to a substantial number of pesticides, this provision of the bill imposes requirements on subsequent producers beyond the licensing fees that a patent holder may receive. In the extreme, a monopoly in the production of a pesticide could ensue if competitors are unable to afford the sometimes costly safety and efficacy tests.
 The prime reason stated for this provision in the Agriculture Committee bill is that without it the pesticides industry will lack incentives to develop new pesticides. Yet, by requiring manufacturers to duplicate test results, portions of the money now spent on developing new pesticides will undoubtedly be diverted to perform such duplicative testing. Consequently, this provision could stifle the very incentives it seeks to achieve.
 S.Rep.No.92–970, 92d Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.Code Cong. & Ad.News 3993, 4096.

4. The Acting Attorney General wrote:
 In economic terms, requiring the submittal of test data imposes an expense on the first applicant to enable him to enter a given market. For others trying to enter the same market, repetition of the same tests imposes a similar entry fee. Such an entry fee, moreover, acts regressively, for it is more of a burden to the small manufacturer. Duplication of such tests is a waste to the economy and a needless and undesirable burden on any subsequent applicant.
 S.Rep.No.92–970, *supra,* 1972 U.S.Code Cong. & Ad.News at 4097.

5. *See* the criticisms on economic grounds of Professor John Stedman, S.Rep.No.92–970, *supra,* 1972 U.S.Code Cong. & Ad.News at 4098–99, and Professor John J. Flynn, S.Rep.No.92–970, *supra,* 1972 U.S.Code Cong. & Ad.News at 4101.

6. EPA noted:
 The effect of this provision is to afford additional economic protection, foster monopoly, and it may tend to restrict pesticide business to large manufacturers. In addition, it would increase not only federal administrative costs, but those of the manufacturer as well, aside from unnecessarily increasing the application time.
 S.Rep.No.92–970, *supra,* 1972 U.S.Code Cong. & Ad.News at 4043.

heavily on a statement by the National Agricultural Chemical Association, defended the exclusive use provision as an encouragement to research toward the development of better and safer pesticides.[7] Eventually the Senate Agriculture and Forestry and Senate Commerce Committees reached the compromise reflected in section 3(c)(1)(D) quoted above. As explained in the Senate report,

> . . . it was decided that fairness and equity required a sharing of the governmentally required cost of producing the test data used in support of an application by an applicant other than the originator of such data.[8]

This compromise version survived conference committee action on the bill.[9]

The 1972 enactment did not define trade secrets. A trade secret was under section 10(a) anything an applicant wanted so to designate, unless the EPA could obtain a judgment overturning the designation. Material so designated was excepted from agency use pursuant to section 3(c)(1)(D). But absent such a designation, EPA was free to use the contents of its own files (without disclosure) in support of an application by another applicant so long as it required that applicant to pay "reasonable compensation."

Prior to 1972, only 18 U.S.C. § 1905 afforded federal statutory protection for the test data, and that protection was against disclosure outside the agency. Moreover, prior to 1972, the EPA was using the contents of its files, without disclosure, in the approval of me-too applications for registration.[10] In opposing enactment of section 3(c)(1)(D) after the deletion of the exclusive use provision, EPA took the position that it did not need an affirmative grant of authority to continue that practice.[11] Thus prior to 1972, neither as a matter of federal statutory law nor as a matter of agency practice was any proprietary right recognized against the government in the contents of agency files. The compromise in the 1972 Act was, therefore, a victory for the National Agricultural Chemical Association, for its effect was to prohibit agency use in approving registrations of anything designated as a trade secret, and to require payment of compensation for test data which was neither protected by a patent nor designated a trade secret. Moreover, the 1972 Act provided for judicial review of the amount of compensation only at the behest of the original submitter, not the new applicant.

The 1972 Act left major retroactivity questions unanswered: (1) whether firms which had submitted data prior to the effective date of the 1972 Act could retroactively designate that data as trade secrets; (2) whether they were entitled to compensation for such previously submitted data; and (3) whether section 3(c)(1)(D) applied to new applications filed before its effective date.[12] Additionally, there was an ambiguity with respect to the effective date.[13] Nor

---

**7.** Report of the Committee on Agriculture & Forestry responding to Commerce Committee's proposed amendments to H.R.10729, S.Rep.No. 92-838, 92d Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.Code Cong. & Ad.News 4023, 4024–25, 4040.

**8.** S.Rep.No.92–838, *supra*, 1972 U.S.Code Cong. & Ad.News at 4092.

**9.** Conf.Rep.No.92–1540, 92d Cong., 2d Sess. (1972), *reprinted in* 1972 U.S.Code Cong. & Ad.News, 3993, 4132.

**10.** *See* the study by the EPA Office of Pesticide Programs. *FIFRA: Impact on the Industry,* reprinted in S.Rep.95–334, 95th Cong., 1st Sess. 34 (1977).

**11.** S.Rep.No.92–838, *supra*, 1972 U.S.Code Cong. & Ad.News at 4043.

**12.** The retroactivity issue not surprisingly spawned litigation. *See e. g., Amchem Corp. v. GAF,* 391 F.Supp. 124 (N.D.Ga.1975) (EPA may rely on test data submitted before 1972 in approving competitor's application for registration), *vacated and remanded for reconsideration in light of 1975 amendments,* 529 F.2d 1297 (5th Cir. 1976), *reinstated on rehearing,* 422 F.Supp. 340 (N.D.Ga.1976), *aff'd in part, rev'd in part on other grounds,* 594 F.2d 470 (5th Cir. 1979).

**13.** EPA in an Interim Policy Statement took the position that section 3(c)(1)(D) applied to applications submitted after November 19, 1973, 38 Fed.Reg. 31862 (Nov. 19, 1973).

did the 1972 Act specifically address the contention that Chevron advances in this case, that it always had a common law property right in the test data in agency files no matter when submitted, which the government could make no use of without paying compensation. We consider that contention in Part II hereafter.

These ambiguities in the 1972 legislation prompted Congress to revisit section 3(c)(1)(D) in 1975. As in 1972, there were major differences of opinion among both legislators and competing lobbyists. In section 12 of the Insecticide, Fungicide, and Rodenticide Act of 1975, Pub.L. 94–140, 89 Stat. 751, the controversial section was amended to read:

> . . . that data submitted on or after January 1, 1970, in support of an application shall not, without permission of the applicant, be considered by the Administrator in support of any other application for registration unless such other applicant shall have first offered to pay reasonable compensation for producing the test data to be relied upon and such data is not protected from disclosure by section 10(b). This provision with regard to compensation for producing the test data to be relied upon shall apply with respect to all applications for registration or reregistration submitted on or after October 21, 1972. If the parties cannot agree on the amount and method of payment, the Administrator shall make such determination and may fix such other terms and conditions as may be reasonable under the circumstances. The Administrator's determination shall be made on the record after notice and opportunity for hearing. If either party does not agree with said determination, he may, within thirty days, take an appeal to the Federal district court of the district in which he resides with respect to either the amount of the payment or the terms of payment, or both. Registration shall not be delayed pending the determination of reasonable compensation between the applicants, by the Administrator or by the court.

The conference committee report describes the intended effect of the amended language to be (1) to reject a House Committee's intent that compensation be paid for data regardless of when supplied to the agency; (2) to provide for compensation only for data received after January 1, 1970, and (3) to require compensation only from new applicants filing for registration after October 21, 1972.[14] The 1975 version thus dealt rather comprehensively with the open question of retroactivity, and made access to judicial review of compensation determinations available to both sides. And while the 1975 version does not say so explicitly, at least implicitly it rejects Chev-

14. New section 12 added by the Senate amended section 3(c)(1)(D) of FIFRA which requires that an applicant for registration of a pesticide pay reasonable compensation if he relies on the test data submitted by another applicant. The amendment provides that only data submitted on or after October 21, 1972, is compensable; the data compensation provision applies to all applications for registration submitted on or after October 21, 1972; both parties to a dispute on compensation of data are given the same rights in the courts; and registration of a pesticide is not to be delayed pending the determination of a dispute on reasonable compensation.

The House bill had no specific language amending section 3(c)(1)(D). However, in the discussion of the bill on the House Floor, it was stated that it was the Committee's intent that on new registrations, the reasonable compensation data provision be applied regardless of when the data relied on was originally received by EPA. If, however, a reregistration is made of a pesticide registered originally prior to October 21, 1972, and data to support the reregistration was in the files of EPA prior to such date, no compensation would be required at the time of reregistration.

The Conference substitute adopts the Senate amendment with a modification which (a) provides that all data submitted in support of an application on or after January 1, 1970 (in lieu of October 21, 1972, as provided in the Senate amendment), is compensable, and (b) makes clear that the provision with regard to compensation for producing test data to be relied upon shall apply with respect to all applications for both registration and reregistration submitted on or after October 21, 1972.

House Conf.Rep.No.94–668, 94th Cong., 2d Sess. (1975), *reprinted in* 1975 U.S.Code Cong. & Ad.News, 1359, 1380–81.

ron's position that there is a common law property right of exclusive use, absent compensation, for materials in the government's files prior to January 1, 1970. That intention is confirmed by the conference committee report quoted in note 14.

In *Mobay Chemical Corp. v. Costle*, 447 F.Supp. 811 (N.D.Mo.1978), *appeal dismissed for lack of jurisdiction*, 439 U.S. 320, 99 S.Ct. 644, 58 L.Ed.2d 549 (1979), Mobay, which had submitted registration data prior to January 1, 1970, challenged the statute on the ground that as amended in 1975, section 3(c)(1)(D) authorized use by the EPA of such data without compensation, in violation of the taking clause of the fifth amendment. The three judge court dismissed the complaint and Mobay appealed directly to the Supreme Court pursuant to 28 U.S.C. § 1253. That Court dismissed the appeal, reasoning that since section 3(c)(1)(D) did not expressly authorize use of pre-1970 data, the challenge was to a longstanding agency practice, which Congress chose not to prohibit, rather than to the constitutionality of a statute. Thus, the Court held, the matter was not one within the jurisdiction of a three judge district court.[15] The *Mobay* case, therefore, tells us no more than that, in the Supreme Court's view, Congress has neither endorsed nor rejected the EPA practice of making use of its pre-January 1, 1970 files in deciding applications for new registrations.

The combination, in the 1975 version of section 3(c)(1)(D), of the cross reference to section 10(b) trade secrets, and of EPA determination of the amount of compensation subject to judicial review, produced an administrative nightmare in which the process of registering new pesticides simply ground to a halt.[16] The result was, for all practical purposes, as complete a bar to new market entrants as if the old registrants held strong patents. Neither EPA nor the Department of Justice was happy with that situation. On the other hand, the National Agricultural Chemical Association still sought exclusive use protection. As a result of mutual government-industry dissatisfaction, in 1977 both the Senate and the House began reconsideration of section 3(c)(1)(D). EPA's principal objection to the 1975 version was the cross reference to section 10(b). Administrator Douglas M. Costle explained to the Senate Agriculture and Forestry Committee:

By enacting the section 3(c)(1)(D) compensation mechanism, Congress wisely provided data developers the ability to *recover reasonable compensation from* subsequent data users. But the major pesticide developers have claimed they are also entitled to determine which applicants shall be allowed to use this data, and thus to set their own price for its use or refuse access to it altogether. Congress rejected the "exclusive use of data" concept in 1972 but the major firms have found that they can obtain "exclusive use" for some period of time simply by making very broad trade secrecy claims and engaging EPA in prolonged litigation.

If Congress desires EPA to implement a truly mandatory data licensing program through the section 3(c)(1)(D) mechanism, and desires to encourage competition and access to the marketplace for registrants who do not develop their own data, the reference to section 10 should be stricken from section 3(c)(1)(D). The result will be that all data can be licensed whether or not it is trade secret.

Statement of April 27, 1977, in S.Rep. No. 95–334, accompanying S. 1678, 95th Cong.,

---

**15.** Justice Blackmun dissented, urging that a three judge court question was presented because the 1975 version of section 3(c)(1)(D) ratified agency practice. 439 U.S. at 321.

**16.** *See* Letter of Administrator Douglas M. Costle to Rep. Foley, Chairman, House Agriculture

Committee, *reprinted in* H.R.Rep.No.95–663, 95th Cong., 1st Sess. 53 (1977), *reprinted in* 1978 U.S.Code Cong. & Ad.News at 1966, 2026; Remarks of Rep. Fithian, 123 Cong.Rec.H. 11864 (Oct. 31, 1977); Remarks of Sen. Leahy, Chairman, Senate Agriculture, Nutrition and

1st Sess., at 70–71 (1977).[17] The Justice Department strongly supported the EPA evaluation of the anti-competitive impacts of the cross reference to section 10(b).[18] As spokesman for the pesticide manufacturers, the National Agricultural Chemical Association not only opposed the EPA proposal, but sought an amendment granting, for all registration data produced by a registrant, trade secret or otherwise, a ten year exclusive use protection.[19] The Senate passed a version of an amended section 3(c)(1)(D) which for the most part adopted the position of the government agencies. That version omitted the trade secret reference, rejected the exclusive use provision, and limited compensation to a period of seven years after registration.[20] The seven year period made it unlikely that protection of test data

would outlast patent protection, although it still conferred a boon on registrants of unpatentable compounds.

In the House, the National Agricultural Chemical Association was more successful than EPA and the Department of Justice. Despite EPA opposition, the House Agriculture Committee proposed H.R. No. 8681, which would have granted a five year exclusive right, followed by a five year compensation right, with compensation to be determined by binding arbitration.[21] The House passed H.R. No. 8681 in October 1977, 123 Cong.Rec.H. 11864 (Oct. 31, 1977), and the following September a compromise on the competing bills emerged from a Conference Committee, which agreed on the current version of section 3(c)(1)(D), quoted in the margin.[22]

Forestry Committee, 124 Cong.Rec.S. 15303 (Sept. 18, 1978).

17. See similarly, Statement of Hon. Douglas Costle before Senate Subcommittee on Agricultural Research and General Legislation, Jan. 9, 1977 in S.Rep. No. 95–334, accompanying S. 1678, 95th Cong., 1st Sess., at 80 (1977). For a more detailed explanation of the EPA views, see EPA Study, Economic Impacts of Proposed Amendments to FIFRA, in S.Rep. No. 95–334, supra, at 59–64.

18. Assistant Attorney General Patricia Wald wrote:

The Department of Justice supports the EPA's evaluation and conclusions with respect to the direct and indirect anticompetitive effects of the trade secret provisions of Section 10 of FIFRA. We concur with EPA that some expression of Congressional intent would be desirable to support the Agency's position on the issues relating to competition in the pesticide industry.

It should be noted that the EPA raises two separate issues: (1) the access to or reliance upon safety efficacy, and environmental chemistry data ("test data"), without actual disclosure, which has been furnished to EPA by developers, and (2) the public disclosure of such data. The Department believes that the competitive issues hinge principally on the ability of applicants to use such test data to satisfy registration requirements. . . .

The Antitrust Division's letter to Mr. Johnson delineates its views concerning sections 3(c)(1)(D) and 10. The Division's letter concludes that the scope of the trade secret provisions of FIFRA may have been improperly extended in denying potential competitors access to test data prepared by developers.

We agree with the position of EPA that "trade secret status should be routinely extended only to truly secret information concerning manufacturing processes." . . . S.Rep.No. 95–334, supra, at 89-90.

19. S.Rep.No. 95–334, supra, at 95.

20. The text of the Senate version is in S.Rep.No. 95–334, supra, at 129-30. The EPA position was set forth not only in the EPA study referred to in note 17, supra, but in a letter from Administrator Costle to the Chairman of the House Agriculture Committee. See H.R.Rep.No. 95–663, 95th Cong., 1st Sess. at 53-54 (1977), reprinted in 1978 U.S.Code Cong. & Ad.News, 1966, 2026–27.

21. See H.R.Rep. No. 95–663, supra, at 18–19, 1978 U.S.Code Cong. & Ad.News at 1991.

22. As finally enacted, section 3(c)(1)(D) of 1978 provides:

(D) except as otherwise provided in subsection (c)(2)(D) of this section, if requested by the Administrator, a full description of the tests made and the results thereof upon which the claims are based, or alternatively a citation to data that appear in the public literature or that previously had been submitted to the Administrator and that the Administrator may consider in accordance with the following provisions:

(i) With respect to pesticides containing active ingredients that are initially registered under this Act after the date of enactment of the Federal Pesticide Act of 1978, data submitted to support the application for the original registration of the pesticide, or an application for an amendment adding any new use

The conference report summarizes the substitute provision:

(1) all test data submitted after December 31, 1969, will be compensable for a period of 15 years from the date the data are submitted;

(2) in the case of pesticides registered after the date of enactment of this provision, there will be a period of exclusive use for data submitted in support of the registration of a product containing a new active ingredient running for 10 years from the date the product is registered, except that there will be no exclusive use for defensive data; and

to the registration and that pertains solely to such new use, shall not, without the written permission of the original data submitter, be considered by the Administrator to support an application by another person during a period of ten years following the date the Administrator first registers the pesticide: *Provided*, That such permission shall not be required in the case of defensive data;

· (ii) Except as otherwise provided in subparagraph (D)(i) of this paragraph, with respect to data submitted after December 31, 1969, by an applicant or registrant to support an application for registration, experimental use permit, or amendment adding a new use to an existing registration, to support or maintain in effect an existing registration, or for reregistration, the Administrator may, without the permission of the original data submitter, consider any such item of data in support of an application by any other person (hereinafter in this subparagraph referred to as the 'applicant') within the fifteen-year period following the date the data were originally submitted only if the applicant has made an offer to the Administrator accompanied by evidence of delivery to the original data submitter of the offer. The terms and amount of compensation may be fixed by agreement between the original data submitter and the applicant, or, failing such agreement, binding arbitration under this subparagraph. If, at the end of ninety days after the date of delivery to the original data submitter of the offer to compensate, the original data submitter and the applicant have neither agreed on the amount and terms of compensation, nor on a procedure for reaching an agreement on the amount and terms of compensation, either person may initiate binding arbitration proceedings by requesting the Federal Mediation and Conciliation Service to appoint an arbitrator from the roster of arbitrators maintained by such Service. The procedure and rules of the Service shall be applicable to the selection of such arbitrator and to such arbitration proceedings, and the findings and determination of the arbitrator shall be final and conclusive, and no official or court of the United States shall have power or jurisdiction to review any such findings and determination, except for fraud, misrepresentation, or other misconduct by one of the parties to the arbitration or the arbitrator

where there is a verified complaint with supporting affidavits attesting to specific instances of such fraud, misrepresentation, or other misconduct. The parties to the arbitration shall share equally in the payment of the fee and expense of the arbitrator. If the Administrator determines that an original data submitter has failed to participate in a procedure for reaching an agreement or in an arbitration proceeding as required by this subparagraph, or failed to comply with the terms of an agreement or arbitration decision concerning compensation under this subparagraph, the original data submitter shall forfeit the right to compensation for the use of the data in support of the application. Notwithstanding any other provision of this Act, if the Administrator determines that an applicant has failed to participate in a procedure for reaching an agreement or in an arbitration proceeding as required by this subparagraph, or failed to comply with the terms of an agreement or arbitration decision concerning compensation under this subparagraph, the Administrator shall deny the application or cancel the registration of the pesticide in support of which the data were used without further hearing. Before the Administrator takes action under either of the preceding two sentences, the Administrator shall furnish to the affected person, by certified mail, notice of intent to take action and allow fifteen days from the date of delivery of the notice for the affected person to respond. If a registration is denied or canceled under this subparagraph, the Administrator may make such order as the Administrator deems appropriate concerning the continued sale and use of existing stocks of such pesticide. Registration action by the Administrator shall not be delayed pending the fixing of compensation;

(iii) After expiration of any period of exclusive use and any period for which compensation is required for the use of an item of data under subparagraphs (D)(i) and (D)(ii) of this paragraph, the Administrator may consider such item of data in support of an application by any other applicant without the permission of the original data submitter and without an offer having been received to compensate the original data submitter for the use of such item of data: ...

7 U.S.C.A. § 136a(c)(1)(D) (1978).

114

(3) there will be a period of exclusive use for data submitted in support of the new use registration of a product equal to the time of exclusivity remaining under any 10-year exclusive use period of the product.

House Conf.Rep. No. 95–1560, 95th Cong., 2d Sess. 30 (1978), U.S.Code Cong. & Ad. News 1978 at 2046. The 1978 version retained the Senate proposal for the exclusive remedy of determination of compensation by binding arbitration, as well as the Senate proposal to eliminate the cross reference to section 10(b), which had permitted the initial registrant to exclude materials from agency use merely by calling them trade secrets. And in the end, Congress retained the January 1, 1970 cut-off date for statutory protection, leaving pre-1970 data in exactly the same posture as when in *Mobay Chemical Company v. Costle*, 439 U.S. 320, 99 S.Ct. 644, 58 L.Ed.2d 549 (1979), the Supreme Court considered the 1975 version of section 3(c)(1)(D); that is, subject to the agency practice of consulting its files when passing on new applications for registration. Moreover, as with the 1975 law, the refusal of Congress in 1978 to extend the compensation provisions of section 3(c)(1)(D) to pre-1970 file data is at least an implicit rejection of the industry's position that it has a proprietary interest in that data for which compensation ought to be paid.

## II.

■ Chevron challenges the constitutionality both of the agency practice of making internal agency use of pre-January 1, 1970 data and of the use and compensation scheme set forth in the 1978 version of section 3(c)(1)(D).[23] It urges that agency use of its pre-1970 data is an uncompensated taking in violation of the taking clause of the fifth amendment. As to the post-1970 data, it contends:

1. that agency use of the data in order to permit registrations by third parties is a taking for private rather than public purposes in violation of due process. *See Thompson v. Consolidated Gas & Utilities Corp.*, 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510 (1937);

2. that even if the taking is authorized, the binding arbitration provision in the 1978 version, an exclusive remedy, deprives it of any opportunity for a judicial determination of just compensation.

Appellant's Brief at 24–33. The district court rejected these contentions, and we reject them as well, although for reasons differing somewhat from those relied upon by that court.

### A.

■ Fundamental to all of Chevron's contentions is its assertion of a property right in the contents of the EPA files insofar as those files contain test data submitted by Chevron in its applications for registration. Before we undertake to explore the intriguing constitutional law issues Chevron tenders, it is appropriate to examine the threshold question whether there is such a property right. In its absence there is no need for a constitutional inquiry. *Cf. Hagans v. Lavine*, 415 U.S. 528, 543–5, 94 S.Ct. 1372, 1382–1383, 39 L.Ed.2d 577 (1974); *Siler v. Louisville & Nashville R. Co.*, 213 U.S. 175, 193, 29 S.Ct. 451, 53 L.Ed. 753, 455 (1909). In several recent cases, the Supreme Court has said that in determining whether federal due process protections apply, we must first find an entitlement created by some law.[24] *Paul v. Davis*, 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976); *Meachum v. Fano*, 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976); *Montayne v. Haymes*, 427 U.S. 236, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976). Both

---

**23.** The complaint was filed after the effective date of section 7 of Pub.L. 94–381, amending 28 U.S.C. § 2284. Thus both the challenge to EPA practice and the challenge to the constitutionality of section 3(c)(1)(D) were properly heard by a single district judge.

**24.** *But see Meachum v. Fano*, 427 U.S. 215, 229–35, 96 S.Ct. 2532, 2540–2543, 49 L.Ed.2d 451 (1976) (Stevens, J., dissenting).

here and in the district court Chevron has assumed more than it has explained the source of the property right it claims. It does rely on the "common law of trade secrets," but if we may borrow Justice Holmes' often misused aphorism, "[t]he common law is not a brooding omnipresence in the sky but the articulable voice of some sovereign or quasi-sovereign that can be identified...." [25]

 Federal protection of intellectual property is statutory, although not necessarily preemptive of state law. *See Zacchini v. Scripps-Howard Broadcasting Co.*, 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977); *Kewanee Oil Co. v. Bicron*, 416 U.S. 470, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974); *Goldstein v. California*, 412 U.S. 546, 93 S.Ct. 2303, 37 L.Ed.2d 163 (1973). Those recent authorities, recognizing a common law of intellectual property not preempted by federal statutes, all are consistent with the Court's analysis in *Paul v. Davis, Meachum v. Fano* and *Montayne v. Haymes, supra,* in looking to the law of some state for the property interest in question. Since 1972, section 3(c)(1)(D) has in one form or another conferred a federal expectation—a property right—in some data submitted to EPA. But prior to the enactment of Pub.L. 92–516, the only federal statute to which we have been referred that appears at all relevant is 18 U.S.C. § 1905. That statute does not confer a private cause of action, although it may provide a standard by which to judge the legality of proposed agency disclosures. *Chrysler Corp. v. Brown*, 441 U.S. 281, 316–17, 99 S.Ct. 1705, 1725, 60 L.Ed.2d 208 (1979). At best it can be construed to create a federal law right of nondisclosure, not of non-use by the agency.

Aside from section 3(c)(1)(D), Chevron has shown us no federal statute preventing internal agency use of the contents of files compiled in the performance of the agency's statutory functions.[26]

 Absent a federal law property interest, then, two questions remain. The first is whether the law of any state having any interest in Chevron purports to confer on it a state law property interest in materials Chevron has voluntarily turned over to a federal regulatory agency in order to obtain a license to sell a product in interstate commerce. The second is whether, assuming a state law purports to do so, such a law is valid when asserted against the federal agency.

As to the first question, we note that neither in Chevron's initial brief nor in its reply brief is *any* state law referred to. The initial brief does rely on Restatement, Torts (1939) § 757, which we may safely assume reflects the law of some relevant state. But that statement of the law affords no help since it deals with liability for disclosure of trade secrets without a privilege to do so. EPA does not propose disclosure. Nor did EPA or its predecessor agencies obtain the material in its files by any improper means, or for the purpose of advancing the business of Chevron's competitors. *Compare* Restatement, Torts (1939) § 759. It is true that the material was submitted to the federal government with some expectation of confidentiality. Prior to 1972, however, 18 U.S.C. § 1905 and agency practice defined the scope of that expectation, and since 1972 the several versions of section 3(c)(1)(D) have done so.[27] None of those statutes could reasonably

---

**25.** *Southern Pacific Co. v. Jensen*, 244 U.S. 205, 222, 37 S.Ct. 524, 531, 61 L.Ed. 1086 (1917), (Holmes, J., dissenting). The aphorism is more appropriate to this case than to that federal admiralty case. *See Moragne v. States Marine Lines*, 398 U.S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970).

**26.** *Cf.* 21 C.F.R. § 314.1(b) (1980) prohibiting FDA use of agency files to register *new* drug

compounds without original registrant's permission.

**27.** Section 10 of the Act, 7 U.S.C.A. § 136h(d) (1978) now authorizes EPA disclosure in certain instances, and to that extent pro tanto limits the applicability of 18 U.S.C. § 1905. Chevron does not in this action directly challenge the authorized disclosure provisions of section 10.

have been the source of an expectation of general agency non-use. *Cf. Mobay Chemical Corp. v. Costle*, 439 U.S. 320, 99 S.Ct. 644, 58 L.Ed.2d 549 (1979). Thus we find nothing in the Restatement of Torts provisions on trade secrets from which, against EPA's internal use, Chevron can take comfort. Moreover, our own researches have produced no state law suggesting a continuing property interest, beyond that provided by federal law, applicable to material furnished to a federal agency as a precondition to selling a product in interstate commerce.[28] That is not to say that Chevron's test data, while it remained exclusively in Chevron's hands, was not protected by state law. Obviously it was, and obviously Chevron was perfectly free to keep it in that state. But it could not do so and at the same time market naled and paraquat in interstate commerce.

We think, moreover, that the recognition of a role for state law in defining the degree of confidentiality in which federal agencies must keep information submitted to them in connection with the discharge of their federal regulatory responsibilities presents the possibility of conflicting state laws imposing conflicting agency responsibilities in different parts of the country. Thus even if there were any state law purporting to protect the confidentiality of data voluntarily submitted to a federal regulator, there is some doubt that it would survive supremacy clause scrutiny. This second question need not, however, be decided, because we find no such state law.

### B.

The district court assumed, at least arguendo, that Chevron had a property interest in its submitted data. On that assumption the court went on to reject Chevron's constitutional challenges.

The court, noting that important benefits derive to the public from me-too registrations, held that there was no merit to the contention that use of the file data to dispose of me-too registrations was a taking of private property for private rather than public purposes. These benefits include administrative cost savings, time saving in the registration process, and competitive benefits in the marketplace from the encouragement of entry by newer and smaller producers. Those factual determinations are not disputed. They, together with our legal conclusion in Part II A. above, make it unnecessary for us to consider whether, as EPA contends, the authority of *Thompson v. Consolidated Gas & Utilities Corp.*, 300 U.S. 55, 57 S.Ct. 364, 81 L.Ed. 510 (1937), has been undermined by subsequent cases such as *Railroad Commission of Texas v. Rowan & Nichols Oil Co.*, 310 U.S. 573, 60 S.Ct. 1021, 84 L.Ed. 1368 (1940), and *Cities Service Gas Co. v. Peerless Oil & Gas Co.*, 340 U.S. 179, 71 S.Ct. 215, 95 L.Ed. 190 (1950).

The district court also rejected the contention that the compulsory arbitration provision in section 3(c)(1)(D) deprives Chevron of the opportunity for a judicial determination of just compensation. In

---

**28.** Indeed, the only relevant decision our researches have uncovered supports our analysis. In *Earthline Corp. v. Mauzy, Acting Director, Illinois Environmental Protection Agency*, 68 Ill.App.3d 304, 24 Ill.Dec. 787, 385 N.E.2d 928 (1979), a unanimous Illinois appellate court held state trade secret law did not prevent the state EPA Director from disclosing to the state attorney general trade secrets voluntarily submitted under the state EPA's licensing requirements, when disclosure was necessary to enforce environmental protection laws. The Illinois court further observed that the Illinois Environmental Protection Act, Ill.Rev.Stat.1977 Ch. 111½, Par. 1007(b)(ii), "states that information submitted concerning persons subject to certain Federal regulatory permit requirements 'may be disclosed or transmitted to other officers, employees or authorized representatives of this state or of the United States concerned with or for the purpose of carrying out this Act.'" 69 Ill.App.3d at 308, 385 N.E.2d at 930. The court found that because "the business in question is, in effect, licensed and the documents sought to be disclosed [to the attorney general] are permits containing information voluntarily given in order to obtain the permit," 69 Ill.App.3d at 309, 385 N.E.2d at 931, and because the attorney general was acting at the EPA's behest, trade secret protection must yield to the effectuation of environmental laws.

support of this ruling the court relied on the *Regional Rail Reorganization Cases*, 419 U.S. 102, 126 (1974), holding that for any taking, a Tucker Act remedy remains available unless by legislation Congress has explicitly withdrawn it. While we express no disagreement with the court's interpretation of the *Regional Rail Reorganization Cases*, we need not decide whether a Tucker Act remedy would in other circumstances be available for agency use of the contents of agency files. In this instance, since we find no protected property interest beyond that conferred in 18 U.S.C. § 1905 and in section 3(c)(1)(D) of the Pesticide Act, there has been no taking for which such a remedy is needed.[29]

## III.

The order denying a preliminary injunction and dismissing the complaint will be affirmed.

---

**29.** Moreover, although Chevron has had, since 1975, a property right in data submitted after December 31, 1969, our determination that no property right subsisted before the 1972 and subsequent amendments to the Pesticide Act, also leads us to conclude that Congress, having

conferred a property right to which the chemical companies had no prior claim, may condition that right to accommodate agency practice. *Cf. Arnett v. Kennedy*, 416 U.S. 134, 94 S.Ct. 1633, 40 L.Ed.2d 15 (1974).