682 F.2d 419
 17 ERC 1737, 12 Envtl. L. Rep. 20,776
 MOBAY CHEMICAL CORPORATION, Appellant in 81-2190 and 81-2191
v.
Anne M. GORSUCH, Administrator Environmental Protection
Agency, Appellee.
PENNWALT CORPORATION, Appellant in 81-2469
v.
Anne M. GORSUCH, Administrator Environmental Protection
Agency, Appellee.
 Nos. 81-2190, 81-2191 and 81-2469.
 United States Court of Appeals,
Third Circuit.
 Argued April 28, 1982.
Decided June 22, 1982.
 
 Daniel M. Dibble (argued), C. David Barrier, Lathrop, Koontz, Righter, Clagett & Norquist, Kansas City, Mo., Cloyd R. Mellott, John W. Ubinger, Jr., Eckert, Seamans, Cherin & Mellott, Pittsburgh, Pa., for appellant Mobay Chemical Corp.
 Aaron C. F. Finkbiner, III (argued), Bradford F. Whitman, Jonathan L. Braff, Dechert, Price & Rhoads, Philadelphia, Pa., for appellant Pennwalt Corp.
 Marcia E. Mulkey (argued), Carol E. Dinkins, Asst. Atty. Gen., Donald W. Stever, Jr., Anne Almy, Patrick J. Cafferty, Jr., Attys., Dept. of Justice, Washington, D. C., Robert S. McLaughlin, Environmental Protection Agency, Washington, D. C., for appellee.
 Before ALDISERT, WEIS and BECKER, Circuit Judges.
 OPINION OF THE COURT
 WEIS, Circuit Judge.
 
 
 1
 In this appeal, two pesticide manufacturers contend that the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA) permits an uncompensated taking of their proprietary data. In addition, one manufacturer asserts that certain regulations promulgated by the Environmental Protection Agency are inconsistent with the statute and were adopted without proper observance of the Administrative Procedure Act. We reject the constitutional challenges but, finding lack of compliance with the APA, grant the EPA six months to adopt regulations in the appropriate manner.
 
 
 2
 Three cases have been consolidated here. In the suit brought in the Eastern District of Pennsylvania, Pennwalt Corporation challenged the constitutionality of the 1978 amendments to FIFRA, 7 U.S.C. § 136 et seq., but the district court granted summary judgment in favor of the EPA. Mobay Chemical Corporation mounted a similar attack in the Western District of Pennsylvania, and questioned certain implementing regulations promulgated in 1979 by the EPA. After trial, the district court upheld the statute and regulations. Mobay Chemical Corp. v. Costle, 517 F.Supp. 254 (W.D.Pa.1981). In a separate action, the court modified an injunction against the EPA entered in Mobay Chemical Corp. v. Costle, 447 F.Supp. 811 (W.D.Mo.1978), before the 1978 amendments were enacted and before the case had been transferred to Pennsylvania. Because the 1978 legislation authorized what the Missouri court had enjoined, the injunction was modified to reflect the statutory changes. Mobay Chemical Corporation v. Costle, 517 F.Supp. 252 (W.D.Pa.1981).
 
 
 3
 * FIFRA was enacted originally in 1947. Ch. 125, 61 Stat. 163 (1947). It makes the EPA responsible for regulating pesticides by "registering" only those products whose use will not harm the environment. 7 U.S.C. § 136a. As part of the licensing process, applicants must submit test data to the EPA demonstrating the safety and efficacy of their products. The development of new pesticides requires a great deal of time, money and skill, and consequently the test data represent a substantial investment by applicants.
 
 
 4
 As amended by the Federal Environmental Pesticide Control Act of 1972, FIFRA permitted applicants to designate portions of their data as trade secrets and prohibited the EPA from disclosing this information. Section 10(a) & (b), Pub.L.No.92-516, 86 Stat. 973 (1972). In addition, the statute was changed so that data submitted in support of an application could not be considered by the agency in support of a subsequent application, unless two conditions were met. First, the later applicant had to compensate the original submitter for use of the data, and second, the original submitter did not designate the data as trade secrets. § 3(c)(1)(D). The 1975 amendments to this section further limited the protection against use of information to data submitted on or after January 1, 1970. Act of Nov. 28, 1975, Pub.L.No. 94-140, 89 Stat. 755 (1975).
 
 
 5
 The Federal Pesticide Act of 1978 removed the trade secret protection over test data provided by § 10(b) of the earlier legislation. Pub.L.No.95-396, 92 Stat. 819 (1978). Applicants were granted a 10-year period of exclusive use for information about new chemicals contained in pesticides registered after September 30, 1978. Section 3(c)(1)(D)(i), 7 U.S.C. § 136a(c)(1)(D)(i). But the EPA may, without the permission of the original applicant, use data presented after December 31, 1969, which is not entitled to exclusive use, in support of another application for 15 years following the original submission. In this event, the later applicant must offer to compensate the original submitter. Section 3(c)(1)(D)(ii), 7 U.S.C. § 136a(c)(1)(D)(ii). If the parties cannot agree on the amount of compensation, either may initiate binding arbitration proceedings. Id. No limitation exists on the EPA's use of data that does not qualify for either the 10-year period of exclusive use or the 15-year period of compensation. Section 3(c)(1)(D)(iii), 7 U.S.C. § 136a(c)(1) (D)(iii).
 
 
 6
 The 1978 amendments also provide for broader disclosure of test data. The EPA may make available to the public any information about the safety and efficacy of pesticides. Section 10(d), 7 U.S.C. § 136h(d). See also, § 3(c)(2)(A), 7 U.S.C. § 136a(c)(2)(A). If necessary, the agency also may disclose trade secret data to contractors with the United States, so long as adequate security measures are taken. Section 10(e), 7 U.S.C. § 136h(e). The EPA may not, however, disclose data to foreign or multinational pesticide producers, unless the original submitter consents. Section 10(g), 7 U.S.C. § 136h(g).
 
 
 7
 Both Pennwalt and Mobay contend that the test data are trade secrets and, as such, constitute intellectual property of "incalculable value." In their view, the FIFRA provisions allowing the EPA to use and disclose the information amount to a taking without just compensation. The companies also argue that the provision for binding arbitration denies them the right to a judicial determination of just compensation.
 
 
 8
 We have reviewed the statutory amendments only briefly because the challenges made to the constitutionality of the use provisions mirror the contentions advanced in Chevron Chemical Co. v. Costle, 641 F.2d 104 (3d Cir.), cert. denied, 452 U.S. 961, 101 S.Ct. 3110, 69 L.Ed.2d 972 (1981). There, we reviewed at length the legislative history of the amendments and their predecessors, and analyzed the claims of property deprivation. We rejected the constitutional challenges, concluding that, in the "use" context, applicants do not have a property interest in data submitted to the EPA beyond that conferred by FIFRA itself.
 
 
 9
 As a panel, we are bound by Chevron. United States Court of Appeals for the Third Circuit, Internal Operating Procedures Ch. VIIIC (1980). Moreover, the arguments advanced in this appeal fail to convince us that Chevron should be reconsidered by the court en banc. We therefore reiterate that an applicant does not have a property interest in data submitted to the EPA that would prevent the agency from using the information in considering other requests for registration. Since there is no protected property interest as against use of the data, we also reject the contention, as we did in Chevron, that the compulsory arbitration provision deprives the original submitters of the right to a judicial determination of just compensation. For the same reason, we will also uphold the action of the court for the Western District of Pennsylvania modifying the injunction against the EPA to reflect the changes made to FIFRA's use provisions by the 1978 amendments.[1]
 
 
 10
 Pennwalt and Mobay attempt to place FIFRA's disclosure provision beyond the Chevron holding. Although that case did not decide whether the EPA's disclosure of data constitutes a taking, the same rationale applies to this issue with equal force. As we said in Chevron, an applicant has no "continuing property interest, beyond that provided by federal law, applicable to material furnished to a federal agency as a precondition to selling a product in interstate commerce." 641 F.2d at 116.
 
 
 11
 An applicant may retain his property rights in data by not disclosing it to anyone. But no taking occurs if the applicant chooses to present the information to the government in exchange for a registration with substantial commercial value. In another case, we rejected a similar constitutional claim where an agency's disclosure of a company's proprietary information was challenged as an uncompensated taking, saying: "(a) voluntary submission of information by an applicant seeking the economic advantages of a license can hardly be called a taking." Westinghouse Electric Corp. v. United States, 555 F.2d 82, 95 (3d Cir. 1977).
 
 
 12
 FIFRA's disclosure provision is not a blanket authorization for the EPA to release confidential information. It limits public disclosure of test data to such matters as the effects of pesticides on human, animal and plant life. Information disclosing manufacturing or quality control processes, details of methods for testing inert ingredients deliberately added to pesticides, and the identity or quantity of such inert ingredients, may not be made public unless necessary for safety purposes. In this circumstance, a mandatory 30-day notification period allows the data submitter to institute an action in a district court to challenge the proposed disclosure.
 
 
 13
 The principle of limited disclosure that Congress applied in § 10 is neither startling nor new. Pesticides serve a useful and important function, but they also may present significant hazards. The public has a very real interest in their use and abuse and may justifiably assert a need to have sufficient information for protection. Congress balanced the understandable desire of the manufacturers to keep their experimental results confidential against the public interest in protecting the health of the community. Both positions were pressed vigorously before Congress, and it adopted a middle ground by providing for limited disclosure. This legislative action was well within constitutional boundaries and we sustain it here.
 
 
 14
 In Corn Products Refining Co. v. Eddy, 249 U.S. 427, 39 S.Ct. 325, 63 L.Ed. 689 (1919), the Supreme Court had no difficulty in rejecting a taking challenge to a statute requiring disclosure of the confidential formula of a food product. After observing that the purpose of the law was to prevent adulteration and misbranding that might mislead purchasers as to the wholesomeness of the product, the Court said:
 
 
 15
 "(I)t is too plain for argument that a manufacturer or vendor has no constitutional right to sell goods without giving to the purchaser fair information of what it is that is being sold. The right of a manufacturer to maintain secrecy as to his compounds and processes must be held subject to the right of the State, in the exercise of its police power and in promotion of fair dealing, to require that the nature of the product be fairly set forth."
 
 
 16
 249 U.S. at 431-32, 39 S.Ct. at 327. See also National Fertilizer Association v. Bradley, 301 U.S. 178, 57 S.Ct. 748, 81 L.Ed. 990 (1937). The same principle requires us to reject Pennwalt's and Mobay's attacks on FIFRA's disclosure provision as well.
 
 
 17
 Mobay's final constitutional challenge is that FIFRA § 3(g), 7 U.S.C. § 136a(g), which directs the EPA to re-register all pesticides "in the most expeditious manner practicable," deprives the company of its right to compensation for data that other applicants relied on in obtaining twenty-three previous registrations. In Mobay Chemical Corp. v. Costle, 447 F.Supp. 811 (W.D.Mo.1978), the Missouri district court decided that the EPA violated the data compensation requirements of the 1972 amendments by failing to require other companies to compensate Mobay for the use of its data. The court refused to declare the registrations invalid, however, because Mobay would be compensated upon re-registration. At the time the Missouri court decided the case, the statute provided that re-registration was to be completed by October 21, 1977. The 1978 amendments removed this deadline, and Mobay asserts that this change is an uncompensated taking.
 
 
 18
 The district court for Western Pennsylvania held that the delay caused by the 1978 amendment does not amount to a constitutional violation. We agree, and note that the Missouri court did not rely on a set date for the completion of re-registration. On the contrary, that court knew that the process was behind schedule, observing that the statutory deadline had already passed. 447 F.Supp. at 823 n.18.
 
 II
 
 19
 In addition to the constitutional challenges to FIFRA made by both appellants, Mobay attacks certain regulations adopted by the EPA. This assault has two phases-lack of conformity to the enabling statute, and failure to observe the rulemaking requirements set out in the Administrative Procedure Act.
 
 
 20
 As part of its program to implement the 1978 amendments, the EPA adopted a policy of generally granting only "conditional registrations" under FIFRA § 3(c)(7), 7 U.S.C. § 136a(c)(7). 40 C.F.R. § 162.7(d) and (e). The agency wanted to use a new approach, known as the "generic standards system," in considering registration and re-registration. 44 Fed.Reg. 76311-12 (Dec. 26, 1979). Under this system, the EPA intends to develop standards for each group of pesticide products containing the same active ingredient. Completion of the generic standards process is expected to take at least 10 years. In the meantime, only conditional registrations will be granted.
 
 
 21
 Mobay contends that FIFRA compels the EPA to review its data after receipt of an application and, as expeditiously as possible, either unconditionally register the pesticide, or deny the registration. Section 3(c)(3), (5), and (6), 7 U.S.C. § 136a(c)(3), (5), and (6). The district court held, however, that the EPA's conditional registration policy does not contravene the statute.
 
 
 22
 Most of Mobay's fire is directed at the agency's "cite all", or data compensation, regulations. These require that, even if he has presented his own data, an applicant must rely on all information in the EPA files which are pertinent to an evaluation of his product and must compensate each data submitter individually. 40 C.F.R. 162.9-4, -5.
 
 
 23
 Mobay contends that the "cite all" regulations violate FIFRA because the statute allows an applicant a choice of three alternate methods of support. Section 3(c)(1)(D), 7 U.S.C. § 136a(c)(1)(D). He may (1) proffer his own test data, "or alternatively" (2) cite that appearing in the public literature, or (3) rely on information previously submitted to the EPA. Since Mobay believes that its own data is adequate to support its applications, it would not choose to cite that of, and pay compensation to, other manufacturers.
 
 
 24
 At one stage of the proceedings in the district court, the EPA conceded that it shared Mobay's interpretation of the statute.[2] At other times in the district court, however, and on appeal, the agency has taken the position that the "cite all" regulations are consistent with FIFRA. On these occasions, the EPA views the phrase "if requested by the Administrator" that appears in the subsection as authorizing it to demand cumulative rather than alternative methods of support. The district judge agreed that the regulations are supported by this reading of the statute.
 
 
 25
 Mobay also complained that an EPA data compensation regulation misconstrues the "formulator's exemption" created by the Act. Section 3(c)(2)(D), 7 U.S.C. § 136a(c)(2)(D). This provision applies to an applicant who seeks to register an enduse product that incorporates a previously registered pesticide purchased from another manufacturer. The end-use applicant is not required to submit or cite data for the incorporated pesticide, nor to offer to pay compensation for the use of previously submitted data.
 
 
 26
 The EPA regulation exempts an end-use formulator from paying any firm for data bearing on the incorporated pesticide. 40 C.F.R. § 162.9-7. Mobay asserts that the exemption should apply only to the manufacturer from whom the formulator purchased the pesticide, since presumably it has included a proportionate share of the testing expense in the price. On the other hand, says Mobay, every other manufacturer who has registered the pesticide is entitled to compensation. The district court disagreed and held that the regulation was consistent with the statute.
 
 
 27
 We need not decide whether the conditional registration and "cite all" regulations are an unreasonable interpretation of FIFRA because we accept Mobay's contention that the regulations were promulgated in violation of the notice-and-comment and effective date requirements of the Administrative Procedure Act. 5 U.S.C. § 553(b) and (d), and § 706(2)(D).
 
 
 28
 Congress enacted the 1978 FIFRA amendments on September 30, 1978. The EPA published proposed data compensation rules on June 20, 1977, based on the provisions of the then-current statute and on the agency's then-current policies. 42 Fed.Reg. 31284. As the agency admits, however, the 1978 amendments "drastically altered" the compensation portions of the Act. 44 Fed.Reg. 27945 (May 11, 1979).
 
 
 29
 On July 25, 1978, the EPA published an Advance Notice of Interim Final and Proposed Rulemaking (ANPR) for the conditional registration program, and solicited comments. It included a suggestion that commenters might also wish to address compensation for the use of data. 43 Fed.Reg. 32154-55. On October 6, 1978, the EPA circulated working drafts of the conditional registration and data compensation regulations to over 2500 interested groups, agencies, and organizations. See 44 Fed.Reg. 27932-33. Then, on October 10, 1978, the agency published a notice of open public meetings to be held in Washington, D. C. during the next month to solicit comments on the conditional registration of pesticides as well as on data review and compensation. 43 Fed.Reg. 46555.
 
 
 30
 On May 11, 1979, the EPA promulgated the present conditional registration regulations as interim final rules, and the data compensation regulations as final rules. 44 Fed.Reg. 27932, 27945. Both sets of regulations were made effective immediately.
 
 
 31
 The EPA recognized that the data compensation regulations "differ significantly" from those proposed in June 1977. 44 Fed.Reg. 27950-51. Nevertheless, it invoked the "good cause" exception to the APA's notice-and-comment requirements on the grounds that reproposal would be "contrary to the public interest" because of the long delay it would cause in resuming the registration program. 5 U.S.C. § 553(b)(B). The EPA justified its action by noting that a working draft was circulated in October and public meetings were held in November 1978, and said it would revise the regulations to the extent appropriate, as judged by its experience and by comments received. Finally, the agency found that these same reasons constituted "good cause" for making the regulations effective immediately, instead of observing the 30-day period between publication and effective date that is otherwise required. 5 U.S.C. § 553(d)(3).
 
 
 32
 The EPA decided not to publish the conditional registration regulations in proposed form because the ANPR, the circulated working draft, and the public meetings had already provided "considerable opportunity for public comment." 44 Fed.Reg. 27933. Publication of a general notice of proposed rule making is not necessary when the "persons subject thereto ... otherwise have actual notice...." 5 U.S.C. § 553(b). The agency again asserted a compelling public interest in resuming the registration program as quickly as possible as a reason for making the regulations effective immediately.
 
 
 33
 The district court found that the June 1977 publication of the proposed data compensation regulations was insufficient notice, since it occurred more than one year before the relevant portion of FIFRA was significantly changed. Moreover, circulation of the working draft in October 1978 was an inadequate substitute for the notice-and-comment procedure because many pesticide companies received their copies too late for review and submission of comments.
 
 
 34
 The court concluded, however, that the EPA had good cause not to re-propose the data compensation regulations because of the need to resume the registration process quickly. As for the conditional registration regulations, the court found that the July 25, 1978 ANPR provided the public with sufficient notice and opportunity to comment. Finally, the court held that the same reasons that justified noncompliance with the notice-and-comment procedure for the data compensation regulations also constituted good cause for making both sets of regulations effective immediately.
 
 
 35
 In considering whether there was good cause for the agency to adopt the data compensation regulations without prior notice-and-comment, we are guided by the principle that the exception is to be narrowly construed. American Iron & Steel Institute v. EPA, 568 F.2d 284, 292 (3d Cir. 1977). Adherence to this principle led us twice before to strike down final regulations published by this agency. Sharon Steel Corp. v. EPA, 597 F.2d 377 (3d Cir. 1979); American Iron & Steel Institute v. EPA, 568 F.2d at 291-92. In Sharon Steel, as here, the EPA asserted an urgent need for action as grounds for disregarding the notice-and-comment procedure. The court rejected this contention, even though it was based on a statutory deadline, and also held that a period for comments after promulgation of a rule cannot substitute for the prior notice and comment required by the APA. 597 F.2d at 381. Cf. Philadelphia Citizens In Action v. Schweiker, 669 F.2d 877 (3d Cir. 1982) (agency's invocation of good cause exception upheld).
 
 
 36
 We still adhere to this view of the matter today, and hold that the agency did not establish good cause to excuse compliance with the APA. As we said in Sharon Steel, "(p)rovision of prior notice and comment allows effective participation in the rulemaking process while the decisionmaker is still receptive to information and argument." 597 F.2d at 381. Suggestions from informed sources are especially valuable when, as here, the agency must implement a complex and technical statute.
 
 
 37
 The record here demonstrates the wisdom of the notice-and-comment procedure. The EPA seems to find FIFRA's mandate confusing because, as mentioned earlier, at trial it admitted that the statute gives applicants a choice of methods for supporting applications, whereas the agency's "cite all" regulations foreclose these alternatives. Understandably, those subject to the regulations profess confusion as well. The EPA's difficult task would have been facilitated had it scrupulously observed the notice-and-comment procedure, since it "enables the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated." Texaco, Inc. v. FPC, 412 F.2d 740, 744 (3d Cir. 1969). Procedural regularity would also help to inspire public confidence in the agency's workings.
 
 
 38
 In evaluating whether the July 25, 1978 ANPR gave sufficient actual notice for the EPA to dispense with the usual APA procedures, "the adequacy of the notice must be tested by determining whether it would fairly apprise interested persons of the 'subjects and issues' before the Agency." American Iron & Steel Institute v. EPA, 568 F.2d at 293. Inspection of the ANPR shows that it falls short of this standard. It states that "(t)he regulations will address the registration of pesticide products on a conditional basis, that is, contingent upon the later submission of certain data normally required prior to registration," and adds that "(t)he regulations will specifically discuss ... the procedures and conditions under which conditional registrations will be granted." 43 Fed.Reg. 32155. Plainly, these generalities are insufficient to alert interested parties to the full extent of the "conditional only" program actually envisioned by the EPA. Consequently, we do not agree with the district court's conclusion that good cause for waiver of the APA has been demonstrated.
 
 
 39
 We are persuaded that the EPA's failure to observe the proper notice-and-comment procedure is directly responsible for many of the problems caused by the regulations. We therefore reject the agency's contention that its violation of the APA is only "harmless error." Nevertheless, we are convinced that to strike down the regulations immediately would generate confusion in the administrative process and unduly delay effective implementation of FIFRA's registration provisions.
 
 
 40
 In reviewing administrative actions, a court of appeals may exercise equitable powers in the choice of a remedy, as long as the court confines itself to the terms of the statute and does not improperly intrude on the agency's powers. Sharon Steel Corp. v. EPA, 597 F.2d at 381. Although appellants are entitled to relief, we should not fashion a remedy so broad as to endanger the Congressional plan for the control of pesticides. Id. To accommodate the conflicting interests at stake here, we shall delay for a period of six months the issuance of a mandate invalidating the regulations. During that time, the EPA shall take all necessary steps to promulgate appropriate regulations in accordance with the Administrative Procedure Act.
 
 
 41
 The judgment of the District Court for the Eastern District of Pennsylvania, our docket No. 81-2469, will be affirmed. The judgment of the Western District of Pennsylvania in No. 81-2190 will be affirmed insofar as it rejected the constitutional challenge of the appellants, but will be vacated as to the EPA regulations which the district court sustained. The judgment of the Western District of Pennsylvania in No. 81-2191 will also be affirmed.
 
 
 
 [1]
 Mobay agrees that its two appeals from the Western District of Pennsylvania stand or fall together on the use issue
 
 
 [2]
 Mobay submitted a set of requests for admissions to the EPA which we reproduce here along with the answers:
 "42. Section 3(c)(1)(D) of the Act provides three distinct methods by which an applicant may satisfy the Act's requirements for data to support his application.
 Answer: Admit.
 
 
 [43]
 The option to support an application by any of the methods provided in Section 3(c)(1)(D) of the Act lies with the applicant
 Answer: Admit."